# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RESTANCA, LLC, a Delaware limited liability company, on its own behalf and in its capacity as Sellers' Representative, and REBY, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>HOUSE OF LITHIUM, LTD., a foreign corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2022-0690-PAF |
| HOUSE OF LITHIUM, LTD.,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>JOSEP GOMEZ TORRES, REBY, INC., and RESTANCA, LLC, in its corporate status and as purported Sellers' Representative,<br><br>Counterclaim-Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

## MEMORANDUM OPINION

Date Submitted: March 30, 2023
Date Decided: June 30, 2023

Daniel A. Mason, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Bruce Birenboim, Jaren Janghorbani, Paul A. Paterson, Kristina A. Bunting, Jonathan C. Day, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Plaintiffs/Counterclaim-Defendants Restanca, LLC and Reby, Inc.*

Matthew D. Perri, Raymond J. DiCamillo, Andrew L. Milam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Alexis Coll, GOODWIN PROCTER LLP, Redwood City, California; Brendan Blake, GOODWIN PROCTER LLP, Boston, Massachusetts; *Attorneys for Counterclaim-Defendant Josep Gomez Torres*.

Daniel M. Silver, Sarah E. Delia, Travis J. Ferguson, Shannon D. Humiston, MCCARTER & ENGLISH, LLP; *Attorneys for Defendant/Counterclaim-Plaintiff House of Lithium, Ltd.*

**FIORAVANTI, Vice Chancellor**

On the evening of April 30, 2022, after being on the job as CEO of a private equity firm for five days, Kevin Taylor electronically signed a signature page committing the firm to acquire all of the shares of a privately held scooter business that it did not already own. The deal had been in the works for months, heavily negotiated by Taylor's predecessor who had been forced out, but was still advocating for the transaction. Taylor had agonized over the decision, but ultimately caved to the demands of the aggressive and impatient co-founder of the target, who refused to make last minute changes to the deal terms and had threatened to walk away. Taylor and his private equity firm suffered a case of buyer's remorse and searched for a way out of the deal. The target has sued to force the buyer to close or to pay damages for breaching the agreement. The buyer has counterclaimed, asserting claims for fraudulent inducement, breach of contract, unjust enrichment, and declaratory judgment. In this post-trial opinion, the court concludes the necessary conditions obligating the buyer to close have not been satisfied, and that the buyer has not proved its fraud and unjust enrichment claims and is otherwise not entitled to damages.

## I.    BACKGROUND

The following recitation reflects the facts as the court finds them after trial.[1]

### A.    Parties

Reby, Inc. ("Reby" or the "Company") is a privately held Delaware corporation with its principal place of business in Barcelona, Spain.[2]  Reby operates a micro-mobility business which contracts with municipalities to offer short term e-scooter rentals through its SaaS platform.  Josep "Pep" Gomez Torres, Kiran Thomas, Cristina Castillo, and Guillem Pagès founded Reby in 2018.  Since 2018, Reby has secured contracts with over a dozen public administrations in Spain and Italy.  Reby, Inc. holds 100% of the outstanding shares of Reby Global, S.L., a European intermediate holding entity for the Company's operating subsidiaries, Reby Rides, S.L., Rodea Electric Vehicles, S.L., and Reby Italia, S.R.L.[3]

Gomez is the chairman and sole member of the Reby board of directors.[4]  Restanca, LLC is Gomez's personal investment vehicle, through which he owns

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text.  After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr."  No disrespect is intended.  Exhibits are cited as "JX #," and facts drawn from the parties' Pre-Trial Stipulation and Order are cited as "PTO ¶ #."  *See* Dkt. 128.  Unless otherwise indicated, citations to the parties' briefs are to their post-trial briefs.

[2] PTO ¶ 6.

[3] JX 368 at 7; JX 179.

[4] PTO ¶ 8; Tr. 131:6–13 (Gomez).  In April 2022, Todd Benge was also a director of Reby. Tr. 131:14–16.

approximately 20% of Reby's outstanding equity.[5]  Gomez founded his first company, an online ticketing platform called "Fever" in 2011, when he was 19 years old.[6]  At the time of trial, Fever was continuing to raise impressive amounts of funding from institutional investors and was valued at approximately $1.3 billion.[7] Gomez left Fever in 2018 and founded Reby the same year.[8]

SOL Global Investments Corp. ("SOL") is a Canadian private equity firm.[9] SOL's shares are traded on the Canadian Stock Exchange ("CSE").  SOL first invested $800,000 in Reby in the first half of 2021.[10]  In July 2021, SOL created House of Lithium, Ltd. ("HOL") as an operating subsidiary to hold SOL's investments in electric mobility.[11]  In November 2021, SOL transferred its interest in Reby to HOL[12] and invested an additional $5 million into Reby, increasing its stake to around 16.67% of Reby's outstanding equity.[13]

---

[5] PTO ¶¶ 7–8.

[6] Tr. 7:7–21 (Gomez).

[7] *Id.* at 8:11–15.

[8] *Id.* at 8:17–9:5.

[9] PTO ¶ 10.

[10] Tr. 14:17–15:9 (Gomez).  The record does not make clear whether this $800,000 is in CAD or USD.

[11] *Id.* at 348:4–7 (Kania); JX 12.

[12] JX 12.

[13] JX 13.

SOL's founder is Andy DeFrancesco.[14] He served as the chief executive officer of both SOL and HOL and as SOL's board chairman until he left both companies on April 25, 2022 under the cloud of a federal investigation.[15] DeFrancesco holds between 20 and 25 percent of SOL's shares.[16] DeFrancesco was replaced as SOL's CEO and chairman by Kevin Taylor, who had joined the SOL board in August 2021.[17]

## B.    The Transaction Chronology

What follows is the chronology of the key events leading up to this action. Other facts are included in the legal analysis.

### 1.    SOL's Early Interest in Reby

SOL first approached Reby regarding a potential acquisition in the summer of 2021.[18] Initially, Reby was uninterested in being acquired, but began to warm to the idea by the fall of 2021 as the relationship between Gomez and DeFrancesco developed.[19] Acquisition negotiations intensified after SOL increased its equity stake in Reby in November 2021 and moved those assets to HOL.[20]

---

[14] JX 174; Tr. 660:5–7 (Taylor).

[15] PTO ¶ 15.

[16] Tr. 712:8–19 (Taylor).

[17] JX 174.

[18] Tr. 15:10–16:8 (Gomez).

[19] *Id.*

[20] JX 12.

On December 10, 2021, HOL and Reby entered into a non-binding term sheet that outlined the process for HOL to purchase all of the equity in Reby that it did not already own (the "First Term Sheet").[21] The First Term Sheet contemplated that HOL would eventually be listed on a recognized stock exchange and that Gomez would be appointed executive vice-chairman of HOL.[22] The First Term Sheet noted the conditions precedent to closing included "satisfactory completion of due diligence by HOL, its counsel and representatives on the business, assets, financial condition, and corporate records of the Issuer which due diligence process shall be concluded on or before the date of entering into the Definitive Documents" as well as "all required regulatory and third-party consents and approvals."[23] Paul Kania, SOL's chief financial officer and then HOL's sole director, signed the First Term Sheet on behalf of HOL.[24]

In mid-January 2022, DeFrancesco created a WhatsApp group named "HoLi Into Over Drive" with SOL leadership.[25] Messaging the group, DeFrancesco emphasized that "we need to accelerate the process with Reby Rides" and noted that

---

[21] JX 18 at 1 ("HOL currently owns 16% of the issued and outstanding shares of the Issuer (the 'Issuer Shares') and wishes to purchase the remaining 84% of the Issuer Shares through the Investment.").

[22] *Id.* at 1–2.

[23] *Id.* at 2.

[24] *Id.*

[25] JX 40.

SOL's second highest immediate priority was to "finalize the deal with Pep & Reby Rides."[26]  HOL was represented by Canadian counsel at Gowling WLG, including Sharagim Habibi.[27]

At the same time, Gomez was soliciting Reby stockholders to sell their shares to him.[28]  Gomez told a colleague on January 26, 2022 that he had been "buying from everyone I caught at $75m" based on his knowledge that the company was worth more and would increase in value once HOL was publicly traded.[29]  He boasted:  "I am buying 80% of [Kiran Thomas's] position . . . and people like lanai and seed investors . . . making dishonest offers, sure."[30]

On January 28, 2022, HOL announced that it had entered into an agreement to acquire Rio Verde Industries Inc. ("Rio Verde"), a publicly traded company, in a reverse takeover.[31]  The press release specified that as a condition precedent to the transaction, Rio Verde would change its name to "HoLi Technologies Inc."[32]

---

[26] *Id.* at 1.

[27] Tr. 28:14–15 (Gomez).

[28] JX 46 at 16.

[29] *Id.*

[30] *Id.* at 19.

[31] JX 49.

[32] *Id.* at 2.  The announcement contemplated that the resulting company would be led by DeFrancesco as CEO, with SOL executives Paul Kania and Richard Waxman serving as CFO and COO, respectively.  *Id.* at 3–4.

On January 31, 2022, HOL and Reby entered into a second term sheet (the "Second Term Sheet").[33] The Second Term Sheet did not displace the First Term Sheet, but rather amended certain provisions.[34] The Second Term Sheet continued to contemplate a transaction between HOL and Reby under which HOL would purchase all outstanding equity in Reby that it did not already own. It included binding provisions that required Reby to refrain from initiating, soliciting, or discussing any outside acquisition proposals, prohibited both parties from publicizing the transaction without consent from the other party, and provided for a $2 million break-up fee if the transaction was not completed by March 15, 2022.[35] In another binding provision, the parties agreed "that the Transaction will be consummated by the execution of one [or] more stock purchase agreements with the stockholders of the Issuer in substantially the form attached hereto as Exhibit A."[36] The exhibit provided for a single secondary sale agreement or "SSA," to be signed in March 2022 by all selling stockholders and for Restanca—Gomez's entity—to serve as a representative for the selling stockholders.[37] It contemplated a closing

---

[33] JX 51.

[34] *Id.* § 8 ("Except as specifically amended hereby, the Term Sheet shall remain in full force and effect.").

[35] *Id.* §§ 3–7.

[36] *Id.* § 5.

[37] *Id.* at Ex. A.

"on the date that the aggregate Purchase Price has been fully paid to the Sellers, which is expected to be June 10, 2022, or such other date as agreed to by the Sellers and the Buyer."[38]  The form SSA contained a signature block for Kania to execute the agreement on behalf of HOL.[39]  Neither the Second Term Sheet nor the form SSA attached to it made any reference to HoLi Technologies Inc. ("HoLi").

On March 8, 2022, HOL's counsel circulated a revised form of the SSA that listed HoLi, not HOL, as the Buyer.[40]  Another version circulated the same day also added what Habibi considered "standard representations and warranties for a transaction of this type."[41]  Among the 33 new representations to be made in respect of the Company, Habibi added a provision providing that final financial statements, audited in accordance with International Financial Reporting Standards ("IFRS"), had been provided for 2020 and 2021 and fairly present Reby's financial condition.[42]  Habibi also added a provision which addressed Reby's compliance with its tax obligations.[43]

---

[38] *Id.* at Ex. A. § 1.3.

[39] *Id.* at 14.

[40] JX 80 at 2.

[41] JX 83 at 1.

[42] *Id.* at 33.

[43] *Id.* at 34.  This section provided, in pertinent part:

Later that day, Gomez circulated a further revised SSA which changed the representation and warranty pertaining to final audited financial statements to apply only to Reby Rides, S.L., the Company's main operating subsidiary.[44] The earlier version of the financial statement representation and warranty did not specify the entities to which it applied. After HOL rejected most of Gomez's edits, Gomez sent a further revision on March 9. Of note, Gomez maintained his earlier changes to the financial statement representation. He also restored much of the language he had previously stricken from the "tax matters" representation, but limited the representation about having filed tax returns and having paid assessments as to the operating subsidiaries, not the parent, Reby, Inc. He struck language stating that the Company had filed all tax returns and timely remitted all amounts to be paid, leaving only a representation that the Company was not aware of any "assessments, reassessments, actions, suits or proceedings in progress, pending or threatened,

---

The Company has filed all tax returns, reports and other tax filings, and has paid, deducted, withheld or collected and remitted on a timely basis all amounts to be paid, deducted, withheld or collected and remitted with respect to any taxes, interest and penalties as required under all applicable tax laws. There are no assessments, reassessments, actions, suits or proceedings in progress, pending or threatened, against the Company, and no waivers have been granted by the Company, in connection with any taxes, interest or penalties.

*Id.*

[44] JX 84 at 7; *see also* Tr. 30:11–31:4 (Gomez). Gomez's cover email noted that the change was "in[ ]line with previous standard R&W we've been giving." JX 84 at 1.

9

against the Company.[45]  Each of these changes made it into the final versions of the SSA that Taylor executed on April 30, 2022.[46]

On March 15, 2022, Reby, HOL, and their respective counsel held a "town hall" meeting to discuss the transaction and changes to the SSA.[47]  The parties analyzed the changed terms, including representations and warranties.[48]  At this time, the parties contemplated that the buyer would be a publicly traded entity and that part of the transaction consideration would be paid in the buyer's shares.[49]

On March 16, 2022, HOL and Reby entered into a third iteration of the term sheet (the "Third Term Sheet").[50]  Like the previous term sheet, it stated that the parties agreed to undertake the transaction by executing "one or more stock purchase agreements" in the form attached, which had been updated to reflect the parties' negotiations.[51]  The Third Term Sheet included binding terms governing the break-

---

[45] JX 87 at 8.  The provision changed the reference to "the Company" to "the Company operating subsidiaries" and added a knowledge qualifier as to the portion of the representation concerning pending or threatened actions against the Company.  *Id.*

[46] *See* JX 225 at 6.

[47] JX 94.

[48] Tr. 539:14–22 (Habibi).

[49] *Id.* at 540:5–545:20.

[50] JX 111.

[51] *Id.* § 2; *see* JX 51 § 5.

up fee and exclusivity terms.[52]  As to the break-up fee, the term sheet required HOL to deposit $2 million with Reby and provided that if the transaction was not completed by April 20, 2022, then the deposit would be applied to the first payment of the cash consideration.[53]  The Third Term Sheet adjusted the closing date to fall between April 10 and April 21, 2022 and described the transaction as the acquisition of "all of the outstanding shares of the capital stock of [Reby] not owned by" HOL, which was defined as the "Buyer."  The form SSA left both the date of the agreement and the date of closing intentionally blank.[54]  The transaction consideration was described as $40 million in cash and $45 million of equity in the "Buyers Shares"

---

[52] JX 111 §§ 7–8.  Whereas the First Term Sheet had expressly disclaimed that its terms were binding and the Second Term Sheet had identified certain provisions as binding while disclaiming the remainder as non-binding, the Third Term Sheet stated at the conclusion of the seventh and eighth sections that those sections were binding on the parties.  *Compare* JX 18 at 3 ("This Term Sheet is qualified in its entirety by the fact that it is non-binding and with further reference to the Definitive Documents; in the event of any inconsistency between the Definitive Documents and this Term Sheet, the Definitive Documents shall reign supreme."), *and* JX 51 § 7 ("This agreement reflects the intention of the parties, but for the avoidance of doubt neither this letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any Party, except with regard to paragraphs 3 through 6 of this agreement."), *with* JX 111 § 7 ("The foregoing provision is binding on the parties."), *and id.* § 8 (same).

[53] JX 111 § 7 ("In the event that the Transaction does not complete by April 20, then the Company and the Buyer hereby agree to apply the Deposit Amount to the purchase by the Buyer of the Company's at a Company valuation of US$100,000,000.  The foregoing provision is binding on the parties.").

[54] *Id.* at 5 ("dated as of April __, 2022"); *id.* at 7 ("Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated hereby and the effective transfer of the Shares to Buyer (the 'Closing') shall take place on April __, 2022, or such other date as agreed . . .  and, in any event, after all of the conditions hereunder have been satisfied or waived."); JX 103 at 1.

11

"on such terms set out in the Definitive Agreement."[55] The Third Term Sheet further recited: "The Company shall provide to the Buyer interim unaudited financial statements of the Company's operating business for 2021 financial year. The Parties understand [that] draft Financial Statements are provisional and may be subject to change."[56] Although the Third Term Sheet defined the Buyer as HOL, the form SSA defined the Buyer as HoLi.[57] On March 17, 2022, HOL delivered $2 million to Reby, which Reby used as working capital.[58]

Despite signing the Third Term Sheet, HOL's lawyers were still concerned about the feasibility of the proposed transaction. After all, HOL planned to go public and had filed a draft listing statement with the CSE in December 2021.[59] HOL received conditional approval of its listing statement, which described the proposed RTO with Rio Verde, in early April 2022.[60] Once HOL became a reporting company, it would have continuous reporting obligations under Canada's National Instrument 51-102.[61] Under Part 8 of National Instrument 51-102, the acquisition

---

[55] JX 111 § 4.

[56] *Id.* § 6.

[57] *Id.* at Ex. A.

[58] PTO ¶¶ 14, 18.

[59] JX 95 at 33.

[60] Tr. 358:8–17 (Kania).

[61] *Id.* at 545:1–20 (Habibi).

of a business such as Reby would likely trigger an obligation to disclose information about the acquired business, including audited financial statements.[62]

HOL's officers and counsel testified that "everyone knew" that HOL would have to complete the go-public process before the transaction could occur.[63] HOL and its counsel were concerned that Reby had not yet provided IFRS audited financial statements for Reby.[64] In addition, HOL was aware that Reby had never filed U.S. tax returns.[65] The parties discussed alternative transaction structures, such as the acquisition of Reby Global, the European intermediate holding company, rather than Reby, Inc., the U.S. parent.[66] In late March, HOL introduced Gomez to MNP LLP ("MNP"), a Canadian accounting firm, to attempt to resolve the issues with Reby's financial and tax liability.[67] MNP representatives, including Michael

---

[62] *Id.*

[63] *Id.* at 537:8–538:6. Gomez's testimony reflects a different understanding on his part, noting that while HOL would go public "eventually," that it was not make or break for the completion of the transaction. *Id.* at 72:10–19 (Gomez); *see also id.* at 635:11–24 (Shumate) (explaining that the timing of when the acquirer would go public was unclear). Gomez's testimony frequently interchanges references to the signing and closing of the transaction, evincing that the distinction may not be clear from his perspective. *See, e.g.,* *id.* at 61:1–4 (Gomez); *id.* at 66:21–67:5.

[64] *Id.* at 552:8–11 (Habibi).

[65] *Id.* at 376:21–23 (Kania).

[66] JX 133; Tr. 552:4–24 (Habibi).

[67] Tr. 636:21–637:1 (Shumate).

13

Shumate, spoke with Gomez and Kania on March 28 and April 26 about potential structures to resolve concerns over the lack of audited financials.[68]

On March 17, 2022, Gomez emailed Habibi, copying representatives of Reby, SOL, and HOL and indicating that he would resend the Third Term Sheet with the "absolute final SPA attached as Exhibit A."[69] "Once we have that, I will be able to start circulating and gathering signatures from our shareholders, which will take weeks anyway."[70] Habibi did not dissuade Gomez from collecting signatures; rather, he thought it was a good idea to begin collecting signatures due to Reby's large number of stockholders.[71]

On April 9, 2022, Gomez began contacting Reby stockholders to obtain signatures on the SSAs.[72] The email request described the transaction as a "tender offer to acquire up to 100% of [Reby's] shares from HoLi Technologies ('*House of Lithium*')" and indicated that "HOL intends to list on one of the senior recognized exchanges in Canada in the next few weeks."[73] Stockholders were informed that

---

[68] *Id.* at 641:1–20; *id.* at 49:19–50:24 (Gomez); JX 477.

[69] JX 115.

[70] *Id.*

[71] Tr. 607:7–24 (Habibi).

[72] JX 155 at 1.

[73] *Id.* The underlined phrases "HoLi Technologies" and "intends to list" were hyperlinks to certain articles discussing HOL's plans to go public. *See* JX 803; *SOL Global Completes*

14

Reby was "trying to get everyone on board, [so] no partial orders will be accepted," and Gomez gave them an April 12, 2022 deadline to indicate their preferred tender option.[74]

### 2. SOL's Management Shakeup

As the parties were trying to iron out the final terms of a deal, SOL and HOL were forced to make a leadership change. On April 25, 2022, SOL announced that DeFrancesco, who had learned that he was under investigation for possible violations of federal securities laws, was removed from his board and officer positions at SOL and HOL.[75] In connection with his termination, DeFrancesco

---

*Disposition of Assets to House of Lithium as It Prepares for Its Upcoming Public Listing*, Bloomberg (Nov. 9, 2021, 8:00 a.m.), https://www.bloomberg.com/press-releases/2021-11-09/sol-global-completes-disposition-of-assets-to-house-of-lithium-as-it-prepares-for-its-upcoming-public-listing; CPE News, *House of Lithium to go public on CSE by way of RTO*, Private Capital Journal (Jan. 30, 2022), https://privatecapitaljournal.com/house-of-lithium-to-go-public-on-cse-by-way-of-rto. Gomez's testimony that he was unaware of the hyperlinks and that the underlining was a "design choice" was not credible in the face of this conflicting documentary evidence. Tr. 159:2–161:10 (Gomez).

[74] JX 155 at 2. HOL devoted much of its briefing to the insufficiency of information that Gomez provided to Reby's investors surrounding the SSAs, insinuating that the Reby stockholders were coerced into signing the SSAs. No Reby stockholders have intervened in this action to argue that their signature on the SSA is ineffective.

[75] JX 174; Tr. 408:9–24 (Kania). In January 2023, the SEC filed a civil complaint against DeFrancesco and others for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. The complaint is focused on conduct in 2018 and 2019 and does not mention SOL or HOL. *See SEC Charges Former Public Company Chairman and Officers in Fraudulent SEC Filings and $8 Million Pump-And-Dump Scheme*, SEC (Jan. 6, 2023), https://www.sec.gov/litigation/litreleases/2023/lr25610.htm.

entered into a separation agreement that required him to continue advising SOL, including as to the management of SOL's portfolio companies.[76]

In the same news release disclosing DeFrancesco's departure, SOL announced that Taylor would immediately replace DeFrancesco as chairman and CEO of SOL.[77] Taylor had joined the SOL board in 2021 and was considered to be the only person who could step into those positions at that time.[78] Taylor had accumulated a wealth of business experience, including involvement in mergers and acquisitions.[79] Taylor tried to ramp up quickly in his new role, building on the knowledge base that he had developed as a SOL director over the prior eight months. In particular, Taylor had multiple discussions with Gomez about the impending Reby transaction.[80] Taylor also continued to speak with DeFrancesco, who was still urging SOL to buy Reby.[81]

---

[76] Tr. 409:9–410:18 (Kania).

[77] *Id.* at 658:22–660:2 (Taylor).

[78] *Id.* at 660:19–661:2.

[79] Taylor had previously served as the president and general manager for a multi-billion dollar division of Nortel Networks, a large Canadian telecommunications company. *Id.* at 654:7–15. He undertook a similar role with another billion-dollar company, the Musson Group, heading its telecommunications distribution company for the Caribbean and Central America. *Id.* at 654:16–22. Following his leadership roles in the telecommunications space, Taylor joined JJR Private Capital, a merchant bank that made investments and provided advisory services. *Id.* at 654:24–655:24. In these roles, Taylor was involved in over a hundred M&A transactions. *Id.* at 656:1–11.

[80] *Id.* at 661:18–662:17 (Taylor).

[81] *Id.* at 714:9–715:12.

16

### 3. The Lead-up to Signing the SSAs

On April 26, 2022, Gomez met with Kania and MNP. The parties discussed Reby's tax issues, acknowledging that there was still no clear path forward.[82] In meeting notes sketched contemporaneously with the meeting, Costa Tsakiris, a partner at MNP, described Reby, Inc. as the ultimate parent, which entirely owned Reby Global, S.L., the European holding company, which in turn owned a Spanish operating company (Reby Rides, S.L.), an Italian company, and other entities.[83] The notes indicate that Reby, Inc. had not "filed US tax returns since 2018 (*i.e.* ever) ≈ reason why cannot buy."[84] Tsakiris specified that the deal contemplated a $130 million purchase price, consisting of $40 million in cash and $90 million in "HOL Can Co stock," or 10% of HOL's total stock.[85]

On April 29, 2022, Gomez informed Taylor that all but two of Reby's stockholders had signed SSAs.[86] In his email to Taylor, Gomez wrote:

> KT, for signing the Reby deal we will create a single bundle with all the SPAs (100 SPAs approx) and one signature page at the end that we will use. That way, since its all bundled you don't have to sign 100 times.

---

[82] *Id.* at 242:6–9 (Gomez) ("Q: . . . MNP did not provide you with a structure. A: They did not provide us with a structure, no.").

[83] JX 179 at 2.

[84] *Id.* (cleaned up).

[85] *Id.*

[86] JX 192. According to Gomez, Mauricio Diaz, the individual who connected Reby with HOL, refused to sign an SSA transferring his Reby shares to HOL due to business issues with HOL. Tr. 55:15–56:3 (Gomez).

We are only missing Mauricio [Diaz's] signature (trying to figure out with Andy and you what we do, let's chat when you can) and then one ex-employee with like 50 shares that we're not able to track her down. Rest is finished on the signed and agreed SPA.[87]

The signed SSAs did not contain provisions governing an outside closing date or a right to terminate.[88] Instead, Section 1.4 provided:

> Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated hereby and the effective transfer of the Shares to Buyer (the "**Closing**") shall take place on April __, 2022, or such other date as agreed to by the Sellers and the Buyer and, in any event, after all the conditions hereunder have been satisfied or waived.[89]

The SSAs continued to identify HoLi as the "Buyer" in the recitals of the agreements.[90] Section 1.2, which concerned consideration, was different among the SSAs, with Reby stockholders receiving cash, stock, or a combination of the two in varying amounts.[91] Otherwise, each SSA was the same.

---

[87] JX 192. Diaz was among those accused of securities fraud in January 2023 along with DeFrancesco. *See SEC Charges Former Public Company Chairman and Officers in Fraudulent SEC Filings and $8 Million Pump-And-Dump Scheme*, SEC (Jan. 6, 2023), https://www.sec.gov/litigation/litreleases/2023/lr25610.htm.

[88] The SSAs do, however, contain a provision titled "Amendment" which states that "Any term of this Agreement may be amended, terminated or waived only with the written consent of Sellers and Buyer." JX 225 § 7.6.

[89] *Id.* § 1.4.

[90] *Id.* at 1.

[91] *See, e.g.*, *id.* at 1–2; *id.* at 22–23.

### 4.    Taylor Signs the SSA on April 30.

On April 30, 2022, Gomez informed Taylor that the bundle of SSAs referenced in the prior day's email had been sent, and he asked Taylor to sign.[92] Taylor, who had been traveling across the country, replied, "Just landed.  3 hrs drive to hotel.  Will sign tonight or tomorrow morning.  On West Coast."[93]  Gomez responded that there was a single signature page on the bundle, "so it's one click."[94] Taylor replied, "Need the lawyers to 'ok' signature.  Have you sent to Karan for review[?]"[95]  Gomez responded affirmatively, adding that "they are all copied and I also shared the folder this morning with them all," and noting that the SSAs matched the form approved in the term sheet, except for an earn-out approved by DeFrancesco and Habibi.[96]  Taylor indicated that Habibi was still reviewing the tax structure with MNP and would stay on them for approval.  Gomez stated, "we already did . . . and they told us how to do it and the spa allows to change the companies and not transfer until [HOL] wants as it will take 3-4 to do what they want to do."[97]  About six hours later, Gomez messaged again:  "Kevin, I'm changing

---

[92] JX 207 at 1.

[93] *Id.*

[94] *Id.*

[95] *Id.*  Karan Sodhi was SOL's and HOL's in-house counsel.  Tr. 597:19–20 (Habibi).

[96] JX 207 at 1.

[97] *Id.* at 1–2.

now your signature page to say HOUSE OF LITHIUM LTD instead of HOLI so you can sign it."[98]  Taylor testified that it was his expectation at this time that he would sign the deal with Reby and its stockholders.[99]

Habibi testified that he also spoke to Gomez on April 30, reminding him that "we could not enter into these SSAs at this time due to the issues around probable transactions and structuring issues that remained."[100]  According to Habibi, Gomez responded that he was getting a lot of pressure from stockholders to return a signed document, but that "he understood that there was still quite a bit of work to be done and that the form of SSA would not, in fact, be the final form of SSA."[101]  Habibi recounted that he knew the stockholders needed to see progress, but "that, ultimately, this was more a good-faith show rather than actually binding the agreement."[102]

Habibi proposed two alternatives.  First, he suggested that the parties enter into a letter agreement similar to the prior term sheets.[103]  Second, he offered to obtain a signature on behalf of HoLi, which he would hold back until the negotiations

---

[98] *Id.* at 2.

[99] Tr. 717:15–718:7 (Taylor).

[100] *Id.* at 558:16–560:3 (Habibi).  Habibi testified that he spoke with Gomez sometime late morning or early afternoon on Mountain Time.

[101] *Id.* at 560:4–10.

[102] *Id.*

[103] *Id.* at 560:11–18.

were finished.[104]   Gomez did not agree to either proposal, opting instead to go directly to Taylor and DeFrancesco.[105]

On April 30, 2022, at 2:25 p.m., Habibi emailed Gomez, attaching a revised SPA with some comments "which will get us comfortable with [sign]ing the SPA now as opposed to waiting until all of the tax/structuring analysis has been done."[106] Habibi noted that the revised agreement reflected changes "to adjust for the fact that it is now a private company purchase by House of Lithium Ltd. (and not a purchase by the anticipate [sic] resulting issuer to the RTO transaction)."[107] Gomez responded minutes later, rejecting Habibi's offer to amend the SSAs.[108] Gomez said that he was not in a position to accept changes to the terms of the agreement, but suggested that HOL create a side letter to implement any necessary changes.[109] Gomez replied again, stating that he was offended by the last minute modifications and that he expected HOL to sign the SSAs now.[110] He said they could work on a side letter

---

[104] *Id.* at 560:19–561:6.

[105] *Id.* at 561:7–9.

[106] JX 217 at 3.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.* at 2.

after the SSAs were signed.[111]  Habibi volleyed back with a three-pronged suggestion:

1. We execute the SPA as is (The CEO will execute the DocuSign)
2. Pep signs a side letter to the SPA as Sellers' Representative acknowledging that certain amendments will be required to the SPA, that the parties will work together to agree on certain amendments, and in the even the parties can't agree on a tax structure that is required for House of Lithium to efficiently complete the transaction or go [] public, then the parties may not be able to close.
3. Reby enters into an instrument that agrees that any funds that are sent in advance of closing are convertible to Reby securities in the event that the transaction doesn't close.  The terms of the conversion would be the same as provided for the first $2 million that we had in the LOI.[112]

Gomez refused to accept the second or third proposals.[113]  In regard to the third proposal, Gomez noted that HOL was "already in default of $9,5M USD that haven't arrived since April 15th."[114]  Gomez drew the line, insisting that he would "wait for [Taylor] to sign the SPA as is in DocuSign where the signature page already says House of Lithium Ltd."[115]

Taylor did not reply to Gomez, but instead removed Gomez from the email chain and engaged in a series of emails with Habibi and inside counsel.[116]  At this

---

[111] *Id.*

[112] *Id.* at 1–2.

[113] *Id.* at 1.

[114] *Id.*

[115] *Id.*

[116] JX 218.  These emails have been withheld on grounds of attorney-client privilege.

stage, Taylor was located in North Bend, Oregon and Gomez was with DeFrancesco in Alabama.[117] For purposes of clarity, the time references in the discussion of these events will be in Pacific Time, which is two hours earlier than the time in Alabama.

At about 6:45 p.m., Taylor messaged Kania, "I'm really struggling how we get out of this: IRS payment REBY - $8m now, $10m May 15 . . . What the hell did I/we get myself/ourselves into."[118] Taylor and Kania traded messages about upcoming financing commitments and the money that would need to be raised to meet them,[119] specifically the impending payment obligations to Reby.[120] After unsuccessfully calling Kania once, Taylor sent a text message to Kania around 7:15 p.m. asking if Kania would be joining a call with SOL lawyers, indicating that

---

[117] Taylor initially testified at his deposition that he had been at his home in Florida on April 30, 2022. JX 442 at 170:21–171:5; *id.* at 194:15–19. He recounted: "I was visibly disturbed that they were calling me [at] 12 o'clock at night so I chose not to call anybody at that time of night." *Id.* at 247:10–13. Discovery revealed that Taylor had actually been in Oregon at the time of signing, a time zone that was three hours behind that of Florida, and that Taylor had conferred with counsel on the evening of April 30, albeit before the series of phone calls with Gomez. Taylor sat for a supplemental deposition to correct this earlier testimony, and at trial Taylor acknowledged his earlier mistaken recollection. *See* JX 463; Tr. 700:10–708:2 (Taylor).

[118] JX 221 at 2.

[119] *Id.*

[120] Tr. 723:12–724:1 (Taylor); JX 442 at 251:3–10.

"[e]veryone else is on."[121] Taylor remained on this call with the company's lawyers for around 40 minutes, ending around 8:00 p.m.[122]

After speaking to his lawyers, Taylor had a series of phone calls with Gomez and DeFrancesco.[123] Taylor said that these calls started off hostile, as Taylor was adamant that he would not sign the SSAs.[124] Gomez told Taylor that he needed a signature that night, otherwise he and his stockholders were prepared to walk away from the deal.[125] Meanwhile, DeFrancesco was in Taylor's ear, encouraging him that signing the SSAs was a good idea.[126] Taylor contends that during the second

---

[121] JX 221 at 2; Dkt. 442 at 251:11–22; *see also* JX 633 (sending dial-in information for the call, which was titled "(call) Reby – SPA").

[122] Tr. 724:4–725:5 (Taylor).

[123] The call log reflects four phone calls, but the first call lasted only one minute. Accordingly, the court will discuss the exchanges that occurred in the three lengthier exchanges that followed. JX 487 at 8. The first substantive call began at 8:07 p.m. and lasted 27 minutes. The next call began at 8:34 p.m. and lasted 34 minutes. The final call began at 9:08 p.m. and lasted 8 minutes. Taylor signed the SSAs at approximately 9:14 p.m. JX 205.

[124] Tr. 645:17–646:7 (Taylor).

[125] *See id.* at 66:16–67:5 (Gomez) ("Q: And what was the substance of that phone call? A: So essentially, you know, Kevin, you know, it was a closing night, right, and essentially Kevin said that he wanted to ideally have more time to review the documents, right, and he just arrived here and Mr. DeFrancesco and I were pushing him, telling him that today is the closing date, this is what we agreed, you know, and I told him if we don't close tonight, maybe we don't close or maybe there's no deal, right, because we've been waiting many -- and doing many extensions, today is the day that we need to close. I understand that you just arrived here, but, you know, your lawyers reviewed it, we gave you time, we've spent six months doing this, it's time to close."); *id.* at 254:17–23 ("[W]hat happened is that I threatened, I said to him essentially, you know, we close tonight, tonight is the closing day, I cannot assure to you that if we don't close tonight there's going to be a deal.").

[126] *Id.* at 714:9–715:12 (Taylor).

24

call between DeFrancesco, Taylor, and Gomez, Gomez stated that he just needed Taylor's signature to pacify his investors and would not enforce the agreements.[127]

Eventually, Taylor asked to speak with Gomez alone and Gomez took DeFrancesco's phone to the lobby of their hotel to continue the conversation.[128] Taylor emphasized that he was "the new sheriff in town" and that Gomez would have to be able to work under Taylor if a deal were to be successful.[129] Taylor, who was threatened by DeFrancesco's relationship with Gomez, wanted to emphasize that he had the final word on decisions related to HOL and SOL.[130] Gomez assured Taylor that he understood the power dynamics and would work with Taylor going forward.[131] According to Taylor, Gomez told him that he would not enforce the agreement, and that upon that basis alone, Taylor signed the SSAs.[132] Gomez denies that he represented that he would not to enforce the agreement.[133] Just before 9:14 p.m., Taylor signed the SSAs on his phone.[134]

---

[127] *Id.* at 731:15–732:6.

[128] *Id.* at 67:6–14 (Gomez).

[129] *Id.* at 68:17–68:4; *id.* at 252:17–24.

[130] *Id.* at 646:13–647:7 (Taylor).

[131] *Id.* at 68:17–68:4 (Gomez).

[132] *Id.* at 646:8–21 (Taylor).

[133] *Id.* at 252:14–16 (Gomez) ("Q: You told him that you wouldn't try to enforce the agreements, didn't you? A: I never said that.").

[134] JX 205.

Early on May 1, 2022, Gomez sent the signed SSAs with Taylor's signature to the SOL team, including Habibi and Kania.[135]

## C.    Post-Signing Events

On Monday, May 2, 2022, Taylor and Gomez met in person to discuss their conversation the previous Saturday night.[136]  Taylor said that he had "reiterated to [Gomez] that there was a number of things that we needed to get started on, given that we were going to -- try to move to get to an agreement that worked for both sides.  Talked about some of the outstanding issues that needed to be resolved."[137]  The understanding between the parties was that they would continue to engage in good faith negotiations to address unresolved issues.[138]

### 1.    HOL Wires Funds to Reby.

On May 4, 2022, HOL wired $1 million to Reby.[139]  HOL had received these funds from JW Asset Management ("JWAM"), an investment group that SOL had co-invested with in the past.[140]  Gomez had been integrally involved in pitching JWAM to invest in HOL and "they made the decision to invest largely because of

---

[135] JX 220; JX 226.  Kania forwarded the link to HOL's in-house counsel no mention of whether anyone considered the signed agreement to be binding or enforceable.  JX 226.

[136] Tr. 669:10–670:1 (Taylor).

[137] *Id.*

[138] *Id.* at 426:2–5 (Kania).

[139] *Id.* at 84:2–15 (Gomez).

[140] *Id.* at 671:16–20 (Taylor).

. . . Gomez."[141]  Gomez was aware that the payment was to be made and followed up frequently with HOL regarding the investment.[142]

Habibi understood the May 4 payment to be a partial payment of the purchase price under the SSAs.[143]  Taylor testified that the payment was a good faith transfer in recognition of Gomez's role in obtaining this $1 million investment from JWAM.[144]

### 2. Taylor Signs a New SSA for Restanca.

After receiving the $1 million payment, Gomez realized that the SSA that Restanca had executed did not accurately reflect the consideration to be paid to Restanca, which was different from that being paid to other Reby stockholders. According to Gomez, he and DeFrancesco had negotiated and agreed upon Restanca's larger share of the transaction consideration after the signing of the Third Term Sheet.[145]  On May 10, Gomez forwarded a revised Restanca SSA to Taylor, asking him to sign at his convenience.[146]  Later that day, Gomez followed up: "[DeFrancesco] wanted me to confirm to you [in writing] that the SPA is the same

---

[141] *Id.* at 671:21–672:7.

[142] *Id.* at 672:17–23.

[143] *See id.* at 621:14–22 (Habibi); JX 233 at 1.

[144] Tr. 673:1–18 (Taylor) ("Q:  Was that wire intended to be a payment to Reby under the SSAs?  A:  No.").

[145] JX 259.

[146] *Id.*

27

and the only thing that has changed is the price, as it was wrong in the previous one."[147]  But Gomez's email was not entirely accurate.  In addition to changing the price term, the updated SSA had removed all references to HoLi Technologies and replaced them with references to HOL.[148]  Taylor signed the updated Restanca SSA on May 10, 2022.[149]

### 3.  Gomez Publicizes the Deal.

Gomez moved quickly to announce the deal, no doubt in part to foreclose any chance of SOL and HOL reneging on the deal.  On May 3, 2022, Gomez emailed to Taylor, Kania, and SOL's PR consultant, Angela Trostle Gorman, a draft news release about the deal that Gomez had prepared.[150]  The news release contained quotes attributed to Taylor and Gomez.  Gomez asked the recipients for comments, indicating that they planned to issue the release on May 4th or 5th.[151]  Gorman replied, "Hi Pep, great to meet you over email.  The release looks great.  When is this slated to cross the wire?  I can supplement the release with direct pitching to relevant U.S. journalists.  Also, congrats!"[152]  Neither Taylor nor Kania responded

---

[147] *Id.*

[148] JX 203; JX 261.

[149] Tr. 682:10–683:17 (Taylor); JX 261.

[150] JX 232.

[151] *Id.*

[152] *Id.*

to the email or offered comments.[153]  On May 5, Gorman pitched the story to the Wall Street Journal and Thomson Reuters on an embargoed basis.[154]  After those outlets balked, Gorman floated other possibilities, including TechCrunch, an online publisher of news about the technology industry and startups.

On Monday, May 9, Gomez circulated a revised news release to Gorman, copying Taylor, Kania, and others.  Gomez's email indicated that the news release was final and the plan was "to launch it on Wednesday."[155]  The news release was dated Wednesday, May 11, and contained quotes attributed to Taylor and Gomez.  Gomez suggested that giving exclusivity to TechCrunch "would be the best in our opinion."[156]  Neither Taylor nor Kania responded to this email.

On May 10, Gorman pitched the story to TechCrunch.[157]  Later that day, Gomez emailed the news release to a TechCrunch writer, stating:  "The news goes out at 11pm ET tonight – you can publish it then."[158]  Later that night, TechCrunch published an article announcing the deal, titled "European micromobility startup

---

[153] Tr. 79:2–5 (Gomez).

[154] JX 242; JX 245.

[155] JX 250.

[156] JX 249.

[157] JX 256.

[158] JX 257.

29

Reby acquired by PE player House of Lithium for $100M."[159] The article included quotes from Taylor and Gomez that were taken from the news release.[160]

Later that night, Gomez forwarded a link to the TechCrunch article to DeFrancesco, Taylor, Diaz, Centner, Kania, and Waxman in a text message.[161] Centner replied, "Excellent."[162] Taylor shared the link to a group chat of SOL executives and received no response.[163] As of the time of post-trial argument, the article was still available online without correction or retraction.

### 4. SOL Begins to Accept Reby Shares.

The stock certificates representing the Reby shares being purchased in the transaction were loaded onto an online share management system called "Carta."[164] Reby then directed Carta to send emails to Kania, SOL's CFO, reflecting the transfer of shares to HOL. To effectuate transfer under the Carta system, the recipient must click on each email transmitting shares and certify acceptance via e-signature.[165] Kania forwarded the emails to Waxman, then a senior associate at SOL, and directed

---

[159] JX 265.

[160] *Id.*

[161] JX 266 at 2.

[162] *Id.*

[163] JX 264.

[164] Tr. 492:12–19 (Waxman).

[165] *Id.* at 449:18–23.

him to accept them.[166]  Waxman, who was aware that the deal had been signed,[167]

complied.[168]

On May 12 and 13, Waxman completed this process 119 times, accepting

approximately 45% of the total shares to be transferred.[169]  At the time of trial, HOL

continued to retain these shares.[170]

### 5.  SOL Presses for More Information.

On May 18, Taylor forwarded Gomez a list of diligence requests from HOL's

counsel.[171]  Taylor told Gomez not to panic, assuring him that the information

requested was "not only critical but absolutely necessary from a securities

perspective if we are to move forward with an RTO / public listing."[172]  Gomez's

---

[166] *Id.* at 387:13–21 (Kania).

[167] In a May 2, 2022, text exchange with SOL's in-house counsel Karan Sodhi, Waxman wrote that he had heard that HOL "closed the SPA with Pep," over the weekend.  JX 229 at 3.  Sodhi replied that "[i]t was signed Saturday night." *Id.*  Subsequent messages in this exchange between Waxman and Sodhi are redacted as privileged.

[168] *See, e.g.*, JX 421 at 5.  Waxman testified that he had no role at HOL.  Tr. 493:1–7 (Waxman).  However, as an employee of SOL, Waxman reported to Kania, the CFO of SOL.  *Id.* at 493:8–11.  At trial, Waxman vacillated on whether Kania instructed him to accept the shares.  *Id.* at 493:16–494:10.  Notably, HOL announced in a January 28, 2022 press release that Waxman would be the COO of the resulting public issuer in the Rio Verde transaction, suggesting that he was closely involved with the affairs of HOL.  JX 50 at 3–4.

[169] Tr. 492:12–19; JX 416.

[170] Tr. 388:8–13 (Kania); *id.* at 450:14–451:4 (Waxman).

[171] JX 300.

[172] *Id.*

response reflected his concern that SOL's counsel, Sharagim Habibi, was causing trouble:

> That's all good for us to prepare for the RTO/public listing. However, I don't think Sharagim understands the acquisition did already happen[] and the contracts are binding since the signature date – there is no leeway to choose whether HoL will or will not proceed with the transaction. It will proceed and it has been signed. . . . As long as we all agree this is the case, and that you require this information for RTO/public listing process only, we are fine. Based on the message from Sharagim and the delays you guys are having on payment we would require explicit written confirmation that this is for the RTO/public listing in response to this message.[173]

Taylor and Gomez spoke later that night. Taylor claims that on this call he reminded Gomez of his promise on April 30 not to enforce the SSAs.[174] The next day, Taylor responded to Gomez's May 18 email, noting: "[A]s discussed on the phone last night, this information is required in order for us to immediately begin engaging the lawyers and regulators as it relates to the pending RTO."[175] Gomez's reply reiterated his view that the parties had a binding agreement: "Perfect. Thank you very much for confirming that the deal already happened, and this is only for the RTO/IPO. That way, there's no confusion on the transaction, which all parties

---

[173] *Id.*

[174] Tr. 689:15–690:2 (Taylor).

[175] JX 305.

signed and agreed on April 29th --and some payments are due and delayed, as you know."[176]

Two days later, on Friday, May 20, Taylor updated Gomez on negotiations with HOL's lender, Next Edge, and requested draft audited financials.[177] Gomez replied that Reby would "do our best to help you guys pay us the money you owe to the Company and its shareholders."[178] Gomez complained that a CAD $800,000 payment to Reby's account had "bounced," and that Gomez expected payment to be made by May 23.[179] Taylor had promised that the funds would be wired by May 23.[180] Gomez reminded Taylor that the last word received from HOL was that the funds required under the agreement would be wired on Tuesday or Wednesday.[181] Gomez stated, "Please also urgently advise if you are no longer planning on wiring by then. Also, can you send any proof I can send to our shareholders with regards to the specific request of Next Edge of providing Reby's 2021 draft audit in exchange of giving you the money to pay us the due amount."[182] The exchange was tense. Taylor interpreted Gomez's response as a threat to sue, and it marked a further

---

[176] *Id.*

[177] JX 312 at 2.

[178] *Id.* at 1.

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.*

deterioration in parties' relationship.[183]   Afterward, Gomez noticed a change in Taylor's behavior and that Taylor began to avoid Gomez.[184]   On May 28, HOL's counsel sent a letter to Reby's counsel detailing numerous alleged "material deficiencies and breaches" and stating that HOL would not close the transaction or make payments under the SSAs until these breaches were corrected.[185]

On May 30, representatives of HOL and Gomez met in person to discuss Reby's business and financials.[186]   Among those present for HOL was ALOE Finance ("Aloe"), a transactional advisory firm.[187]   Gomez dialed in Benge, Reby's CFO, to discuss the financial statements.[188]   The parties met again on June 1.  Gomez was protective of the information that he shared during these meetings.   HOL's contemporaneous notes confirm that Gomez was unwilling to provide documents to

---

[183] Tr. 692:9–18 (Taylor).

[184] *Id.*

[185] *Id.*; JX 327.  At trial, Defendant's counsel objected to JX 327 as an impermissible settlement discussion under Rule 408 of the Delaware Rules of Evidence.  Defendant briefly renews this objection in its post-trial answering brief.  Def.'s Answering Br. 22 n.14.  Rule 408(b) provides that evidence of compromise negotiations can be admissible for other purposes.  Del. R. Evid. 408(b).  This exhibit serves only to establish when Plaintiffs received notice that Defendant did not intend to perform under the agreement and is admissible for this limited purpose.

[186] Tr. 456:2–18 (Waxman).

[187] *Id.* at 455:15–22.

[188] *Id.*

HOL or Aloe for review.[189] They also reflect that Gomez "considers agreement signed on April 29 as binding acquisition close. Pep thinks Andy/SOL is wanting to renegotiate because of challenging market conditions making it hard to raise funds."[190] On June 15, 2022, Reby's counsel sent a letter to HOL's counsel demanding that HOL perform under the contract and threatening to sue regarding the transaction.[191] Taylor responded to his legal counsel and internal team, "Let's huddle tomorrow or early next week to determine next steps. Obviously we need to aggressively move forward with the current restructuring plans."[192] In June, SOL had been contemplating different possibilities for restructuring its investments, including HOL.[193] It does not appear that a restructuring ever occurred.[194]

On July 6, the parties entered into a tolling and standstill agreement. In the meantime, HOL was desperate to find any excuse to get out of the deal. On July 10, 2022, after receiving Reby's latest financials from Gomez, Taylor forwarded them to Waxman. He wrote: "Latest financials from Pep. I'm meeting with him on Wednesday. Hopefully you are available. Need a kill shot or I may kill him I[']m

---

[189] JX 341. Gomez used a personal projector to display documents on a wall in the HOL conference room. Tr. 458:8–21 (Waxman).

[190] JX 341.

[191] JX 358.

[192] JX 515 at 5.

[193] Tr. 772:14–773:3 (Taylor); JX 366; JX 442 at 441:12–444:8.

[194] JX 442 at 447:5–7.

so upset with him."[195] The next day, Taylor emailed Centner, Kania, Waxman, and individuals from Aloe, attaching several documents received from Reby and asking them to dig up any discrepancies in the Reby's financials. He told them, "[t]he goal is to negotiate our way out of this transaction, so anything will help."[196] Waxman asked if they should focus on the documents that Taylor had circulated or whether Taylor wanted them to look into other issues. Taylor responded with one word: "Everything."[197]

## D. Procedural History

On August 8, 2022, Restanca and Reby ("Plaintiffs") initiated this action.[198] The complaint asserted claims for breach of contract and specific performance, for breach of the implied covenant of good faith and fair dealing, and for declaratory judgment establishing the parties' rights under the SSAs. The parties agreed to expedite the proceedings and to set trial for early December 2022.[199] On August 26, 2022, HOL answered the complaint and asserted counterclaims for fraudulent inducement against the Plaintiffs and Gomez, for unjust enrichment against Reby,

---

[195] JX 382 at 1.

[196] JX 385 at 1.

[197] *Id.*

[198] Dkt. 1.

[199] Dkt. 8.

and for breach of contract and declaratory judgment against the Plaintiffs.[200] Defendant asserted fourteen affirmative defenses, arguing that Plaintiffs' claims fail because Plaintiffs cannot demonstrate harm, because Plaintiffs materially breached the SSAs, and because Plaintiffs failed to satisfy conditions precedent under the SSAs.[201] On October 7, 2022, Defendant moved to bifurcate the liability and damages portions of the trial.[202] After briefing, the court denied the motion.[203]

Prior to trial, the parties clashed over several motions in limine. Both parties moved to exclude the other's expert.[204] Plaintiffs moved to preclude testimony from Habibi or Shumate as untimely and violative of the sword-shield doctrine.[205] They also moved to exclude evidence regarding the Aloe meetings and report as impermissible evidence of compromise offers and negotiations, and to exclude evidence regarding the TechCrunch article because it raised a sword-shield issue.[206] The court denied the motions as to Habibi and Shumate, Aloe finance, and the TechCrunch article without prejudice, allowing Plaintiffs to present them at trial and in post-trial briefing.

---

[200] Dkt. 18.

[201] *Id.* at 26–28.

[202] Dkt. 62.

[203] Dkt. 79.

[204] Dkts. 106, 108.

[205] Dkt. 107.

[206] Dkts. 84, 109.

The court held a three-day trial from December 7 to December 9, 2022. There were over 650 trial exhibits. Six fact witnesses and two experts testified at trial. The parties also submitted deposition transcripts from three other witnesses. The parties completed post-trial briefing and presented post-trial argument on March 30, 2023.

## II.     ANALYSIS

To resolve this case, the court must answer a series of questions. First, did the parties enter into an enforceable contract? That question is dually pronged here, requiring the court to determine whether the parties intended to be bound and whether the terms of the contract are sufficiently definite. If the contract is valid, was there a breach or is any party otherwise excused from performing? Lastly, is either party entitled to damages?

As explained below, the court concludes that the parties formed an enforceable contract but that HOL has no obligation to close the transaction because Plaintiffs' representations are not true and correct.

Before turning to this flowchart of contractual queries, the court addresses several lingering evidentiary issues.

### A.     Admissibility of Evidence

#### 1.     Can the court consider Habibi's testimony?

Plaintiffs seek to preclude the testimony of HOL's deal counsel, Sharagim Habibi, because HOL identified him as a trial witness on the eve of trial and then prevented Plaintiffs from obtaining discovery from him on certain issues by

38

invoking attorney-client privilege. Primarily, Plaintiffs seek to bar Habibi's testimony about his discussions with Gomez on April 30 and his communications regarding the lack of authorization to disseminate the press release announcing the transaction.[207] When Plaintiffs inquired further into Habibi's conversations with HOL executives about these topics, Habibi followed counsel's instruction not to answer on grounds of privilege.[208]

As a threshold matter, Habibi's testimony will not be excluded due to his late identification as a trial witness. In expedited litigation, witnesses are sometimes identified late in the schedule for a variety of reasons. Habibi was known to Plaintiffs as a person with knowledge early on.[209] When he was identified as a trial witness, he was made available for a deposition. There is no prejudice to Plaintiffs due to the timing of his identification as a witness. For those reasons, the motion to exclude Shumate's testimony is also denied.

The attorney-client privilege protects confidential communications between a lawyer and client made for the purpose of rendering legal services to the client. *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992). The attorney-client privilege protects "legal advice, as opposed to business or personal advice," and communications, as

---

[207] Pls.' Opening Br. 27–28, 41–42.

[208] *See, e.g.*, Tr. 569:14–570:18 (Habibi); *id.* at 627:7–19; JX 472 at 166:4–19.

[209] JX 411 at 13.

opposed to underlying facts. *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2009 WL 2031793, at *2 (Del. Ch. July 10, 2009). "The courts of this State have refused to allow a party to make bare, factual allegations, the veracity of which are central to resolution of the parties' dispute, and then assert the attorney-client privilege as a barrier to prevent a full understanding of the facts disclosed." *Tackett v. State Farm Fire & Cas. Ins. Co.,* 653 A.2d 254, 259 (Del. 1995). Here, HOL erected privilege as a barrier to prevent Plaintiffs from inquiring further into Habibi's testimony on factual issues that are central to this case. Although it is possible that some of those communications may have been privileged, HOL's broad assertion of privilege prevented Plaintiffs from ascertaining purely factual information. For example, Habibi's communications to HOL about what Gomez may have said to Habibi on April 30 is factual information that is discoverable. That Habibi happens to also be a lawyer does not permit HOL to withhold those facts under a cloak of privilege. *See Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Servs. of Cincinnati, Inc.*, 1995 WL 347799, at *2 (Del. Ch. May 17, 1995) ("[Plaintiff] cannot invoke the attorney-client privilege to block [Defendant's] inquiry into the facts that caused [the witness] to conclude that [plaintiff] had an improper motive for bringing this lawsuit or engaged in a regulatory violation, even though she learned these facts from [plaintiff's] general counsel."). The court will not allow such tactics, in which a party seeks to use privilege both as a "sword" and as a

40

"shield." *See Ashmore v. Metrica Corp.*, 2007 WL 1464541, at *1 (Del. Ch. May 11, 2007) ("Principles of waiver and fairness [prevent] a party from using the privilege as both a sword and a shield[.]"); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 1987 WL 12500, at *6 (Del. Ch. June 19, 1987) ("As a general matter, a party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.").

Accordingly, the court will not consider Habibi's testimony that Gomez told Habibi he would not enforce the SSAs or Habibi's testimony concerning the May 11 news release and TechCrunch article. As for the remainder of Habibi's testimony, the court will give it the weight it deserves.

### 2. Should the court draw an adverse inference from the absence of DeFrancesco?

Unfortunately, the evidentiary record lacks testimony from a central figure in this dispute—DeFrancesco. DeFrancesco was the catalyst for this transaction and served as HOL's primary negotiator throughout the process. Although his employment and leadership positions at SOL and HOL terminated on April 25, 2022, his involvement in the transaction did not.[210] His separation agreement provided for him to continue advising SOL, and he did so in connection with the Reby deal. DeFrancesco was the critical third individual on calls between Taylor and Gomez,

---

[210] Tr. 709:14–17 (Taylor).

41

including the April 30 call on which Gomez is alleged to have told Taylor that he would not enforce the SSAs. Although he was not present for the last call between Gomez and Taylor, DeFrancesco was physically present with Gomez in Alabama and communicated with him shortly after the conversation ended. DeFrancesco also remained involved in the process after the SSAs were signed.[211] In fact, multiple witnesses for HOL testified that they were in contact with DeFrancesco shortly before their testimony in this matter,[212] and at the time of trial, DeFrancesco was required to continue advising HOL under the terms of his separation agreement.[213]

Plaintiffs argue that HOL's failure to present DeFrancesco as a witness warrants an inference that his testimony would have been adverse to HOL's position at trial—specifically as to what Gomez did or did not say to Taylor on April 30.

"It is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Smith v. Van Gorkom*, 488 A.2d 858, 878–79

---

[211] *Id.* at 410:6–12 (Kania); *id.* at 710:17–23 (Taylor); JX 23; JX 355 (depicting a message from DeFrancesco that Gomez "will re-trade the deal or we will bury him" and a message from Centner asking DeFrancesco to "make that clear to Pep" and organizing a strategy meeting with DeFrancesco and Taylor).

[212] Tr. 410:14–412:15 (Kania) (noting that he spoke to DeFrancesco five to six days before his deposition, one week before his supplemental deposition, and within a week of his testimony at trial); *id.* at 711:18–20 (Taylor) (noting that he spoke to DeFrancesco two days before testifying at trial).

[213] *Id.* at 711:4–17.

(Del. 1985), *overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1118 n.7 (Del. 1994); *Young v. Red Clay Consol. Sch. Dist.*, 159 A.3d 713, 791 n.510 (Del. Ch. 2017); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 300–01 & n.7 (Del. Ch. 2000). "[I]f the record lacks documentation relating to a particular event, and if it is reasonable to expect that documentation would exist if the event took place, then the plaintiffs are entitled to a reasonable inference that the event did not occur." *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at \*2 (Del. Ch. Apr. 26, 2023).

HOL argues that it would be inappropriate to draw an adverse inference here for two reasons. First, HOL contends Plaintiffs failed to properly subpoena DeFrancesco. During discovery, Plaintiffs requested that HOL make DeFrancesco available for a deposition. HOL did not do so. Plaintiffs then served DeFrancesco in California with a subpoena that sought a deposition in Florida. DeFrancesco, who was represented by HOL's counsel, objected to the subpoena, declining to produce documents or appear for a deposition and asserting that DeFrancesco was not a resident of California and could not be compelled to comply with a California

43

subpoena.[214]  Plaintiffs did not move to enforce the subpoena or serve a new one.[215]

Rather, when HOL informed Plaintiffs that it did not intend to call DeFrancesco at trial and would not make him available for a deposition, Plaintiffs chose not to further pursue DeFrancesco's testimony or documents.

Second, HOL argues that an adverse inference is unwarranted because DeFrancesco is no longer within the control of HOL.[216]  HOL contends its inability to control DeFrancesco distinguishes this case from those upon which Plaintiffs rely. *See Senior Housing Cap., LLC v. SHP Senior Housing Fund, LLC*, 2013 WL 1955012, at *42 (Del. Ch. May 13, 2013) (noting that the failure of any employee to testify as to their intention undercut the company's argument); *Kahn*, 638 A.2d at 1118 n.7 (noting that the failure of the independent committee's chairman to testify

---

[214] JX 628; JX 629; JX 630.  In addition to objecting to the requests for document production as overbroad and unduly burdensome, DeFrancesco argued that "HoL's production of documents in the litigation pursuant to the Search Parameters will satisfy fully any obligation Mr. DeFrancesco has to produce documents in response to this Request."  JX 630 at 8–13, 15.

[215] On October 21, 2022, Plaintiffs filed a motion to compel discovery into the circumstances surrounding DeFrancesco's departure.  Dkt. 86.  Ten days later, Plaintiffs' counsel filed a letter withdrawing the motion in light of further discovery that Defendant had provided to moot the motion.  Dkt. 95.

[216] HOL also argues that Plaintiffs have forgone their right to seek an adverse inference by relying on statements of DeFrancesco, which HOL contends are hearsay unless DeFrancesco is an unavailable witness.  Def.'s Answering Br. 57.  But HOL never challenged these statements as hearsay and that even if it had, these statements may be admissible as non-hearsay because they are "offered against an opposing party and . . . [were] made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Del. R. Evid. 801(d)(2).

permitted drawing an adverse inference); *Chesapeake Corp.*, 771 A.2d at 300–01 (giving no weight to certain evidence where key insiders, including the CEO, did not testify).

Those opinions, however, do not explicitly state that a non-testifying witness must be an employee of the party against whom an adverse inference is drawn for the witness's failure to appear. Each relies on the court's statement in *Van Gorkom* that "the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Van Gorkom*, 488 A.2d at 879.

The federal courts follow the "uncalled witness" rule, which states that "'if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.'" *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046 (5th Cir. 1990) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)). "The 'missing witness' rule permits, rather than compels, the factfinder to draw an adverse inference from the absence of a witness, . . . particularly where the factfinder concludes that the party who requested the adverse inference failed to subpoena a witness otherwise available to testify." *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 67 (1st Cir. 2003). The witness must be "peculiarly within the control" of the party against whom the inference is drawn,

ensuring that the inference is not drawn "against a party who, in comparison with an adversary, lacks meaningful or pragmatic access to the witness." *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997). While an employer-employee relationship is the paradigmatic example of a control relationship, federal courts have held that other types of close relationships may satisfy the requirement, including the relationship between a defendant and his mother-in-law and between a defendant and her son. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 406 n.172 (S.D.N.Y. 2014) (citing *Gaw v. Commissioner*, 70 T.C.M. (CCH) 1196 (T.C. 1995), *aff'd*, 111 F.3d 962 (D.C. Cir. 1997) and *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1053 (7th Cir. 1974)).

A witness's availability depends on "all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir. 1973). Where the witness is equally available to both parties but is not called, "the court has discretion to (1) give no instruction and leave the entire subject to summations, . . . (2) instruct the jury that no unfavorable inference may be drawn against either side, . . . or (3) instruct the jury that an adverse inference may be drawn against either or both sides." *Caccia*, 122 F.3d at 139. "An adverse inference is not warranted, . . . where the controlling or related party makes the missing witness available to its opponent, the party seeking the adverse inference equally could obtain the missing

witness's testimony, or the party seeking the adverse inference made no attempt to obtain the witness's testimony." *Donziger*, 974 F. Supp. 2d at 701.

Both parties had some sort of relationship with DeFrancesco. Gomez and DeFrancesco had established a tight relationship over the course of their negotiations. DeFrancesco also continued to have a strong relationship with HOL as an adviser and as a major SOL stockholder. After the relationship between Gomez and HOL broke down, DeFrancesco sided decisively with HOL.[217] Plaintiffs could have, but chose not to press for DeFrancesco's deposition. Although it is a close call, the court does not draw an adverse inference from DeFrancesco's absence at trial.

### 3. Can the court consider the Aloe meetings or reports?

Under Rule 408 of the Delaware Rules of Evidence, "evidence of an offer in compromise is inadmissible if offered for the purpose of proving or disproving liability with regard to the claim that is the subject of the settlement discussion. Such evidence may be admissible, however, if offered for another purpose." *Grunstein v. Silva*, 2011 WL 378782, at *6 (Del. Ch. Jan. 31, 2011). "Two principles underlie Rule 408: 1) the evidence of compromise is irrelevant since the offer may be motivated by a desire to terminate the litigation rather than from any concession of

---

[217] JX 355 (slinging profanities at Gomez and noting that Gomez "will re-trade the deal or we will bury him – I don't care[.] We come first and our home comes first").

47

weakness of position; and 2) public policy favors compromise in settlement disputes." *Cap. Mgmt. Co. v. Brown*, 813 A.2d 1094, 1100 (Del. 2002).

Plaintiffs urge the court to exclude evidence of the Aloe meetings and report, arguing that they are inadmissible evidence of settlement negotiations.[218] While HOL opposed the motion to exclude evidence regarding the Aloe meetings and report before trial, it did not respond to Plaintiffs' renewed motion after trial.[219] Plaintiffs proffered evidence that the meetings were for settlement purposes.[220] By failing to respond, HOL has waived its right to oppose the motion to exclude the testimony and evidence surrounding the Aloe meetings and findings. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *6 n.42 (Del. Ch. July 31, 2020) (deeming failure to address evidentiary objection in post-trial briefing a waiver). Accordingly, the objection is sustained and the court does not consider the evidence surrounding the Aloe meetings or report for purposes of deciding the issues of breach.

### B.    Contract Formation

To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and resulting harm. Under Delaware law, "a valid contract exists when (1) the parties intended that the contract

---

[218] Pls.' Opening Br. 31.

[219] *See* Dkt. 116.

[220] Tr. 107:8–13 (Gomez).

would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). Plaintiffs bear the burden of proving the existence of a contract by a preponderance of the evidence. *Morton v. Evans*, 1998 WL 276228, at *2 (Del. Ch. May 15, 1998). "Proof by a preponderance of the evidence means proof that something is more likely than not." *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015) (internal quotation omitted).

The parties here dispute the existence of a valid contract, focusing on the first two elements of the test—whether the parties intended to be bound and whether the terms of their agreement were sufficiently definite. Those issues require related but distinct inquiries. *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) ("*Eagle Force I*"). The court must make separate factual findings as to each element. *Id.* Accordingly, if the parties intended to be bound and the terms of their contract were sufficiently definite, they will have formed an enforceable contract.

### 1. Intention to Be Bound

"Whether a party manifested an intent to be bound is a question of fact." *Eagle Force Hldgs., LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020) ("*Eagle Force II*"). "Under Delaware law, 'overt manifestation of assent—not subjective intent— controls the formation of a contract.'" *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*,

49

2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)).

There is no dispute that Taylor signed the SSAs on behalf of HOL on April 30, 2022. That act alone is the strongest evidence of an intent to be bound. "[T]he act of placing signatures on the signature lines at the end of a contract is so universally recognized as the means of accepting and binding one's self to the contract" that in all but the most unusual case "no other act or statement is ordinarily required." *Eagle Force II*, 235 A.3d at 736. "[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound." *Eagle Force I*, 187 A.3d at 1230. "[A] wet ink, signed version of a contract looks to be solid evidence of a meeting of minds. But it is not evidence so powerful that it negates all other evidence to the contrary." *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019). When presented with a facially valid contract, the court will defer to the parties' signed writing unless there is evidence to the contrary. *Malkani v. Cunningham*, 2023 WL 1383938, at *8 (Del. Ch. Jan. 31, 2023). "[W]hether in any particular case involving oral negotiations it is 'clearly understood' that the proposed contract is tentative only is a question of intention to be inferred from the evidence. Where the evidence is conflicting and two inferences are possible, as here,

the question is for the [factfinder]." *Chrysler Corp. v. Quimby*, 144 A.2d 123, 131–32 (Del. 1958).

In *Eagle Force*, the defendant successfully established on remand that it was the signor's practice to endorse draft contracts to acknowledge receipt, that his signature was requested to acknowledge receipt at signing, and that the signed document was marked as a draft. *Eagle Force II*, 235 A.3d at 736–37. These factors, taken together, were sufficient to overcome the signed agreement and other contemporaneous indicia of a binding contract. *Id.*

The pre-signing and contemporaneous evidence in this case tilts in the other direction. The parties negotiated extensively, executing three term sheets during the course of several months to memorialize their deal.[221] When Gomez communicated to HOL that he would begin the process of obtaining stockholder signatures on the SSAs, HOL did not object.[222] On April 29, 2022, Gomez first sent the bundle of SSAs.[223] He would resend the document for signature two more times, later in the same day on April 29 and again moments before Taylor signed the document.[224] On April 29, 2022, Gomez also sent a series of WhatsApp messages to Taylor, "KT the

---

[221] *See* JX 18; JX 51; JX 111. HOL's counsel, Habibi, observed in mid-March that "this SPA has been heavily negotiated" and contains terms that are "extremely off-market and devoid of any standard reps in favour of the purchaser." JX 118 at 6.

[222] JX 115; JX 118.

[223] JX 205.

[224] *Id.*

bundle has just been sent," "if you could sign that would be great."[225] Taylor responded that he "[w]ill sign tonight or tomorrow."[226] Taylor later added that he was waiting on the company's lawyers to "ok" the signature.[227] HOL never indicated in the days leading up to the signing of the SSAs that it did not intend to sign them.[228] Contemporaneous communications confirm that Taylor expected to sign the agreement and to have payment obligations under the agreement.[229]

On April 30, Gomez again began to press Taylor for a signature. Gomez discussed the deal with Habibi, who offered alternatives to the current form of the agreement, including a signature now that would not become binding until later. Gomez rejected this proposal. Gomez likewise rejected the next two proposals from Habibi, which included changing the terms of the SSAs and entering into a side letter. Taylor communicated with counsel numerous times, including for at least 40 minutes on a conference call. Having conferred extensively with counsel, he then began a sequence of phone calls with Gomez and DeFrancesco and ultimately signed the SSAs. Taylor was an experienced and informed participant, having done many

---

[225] JX 207.

[226] *Id.*

[227] *Id.*

[228] Tr. 613:1–17 (Habibi).

[229] JX 221 at 2.

52

M&A transactions over the course of his career.[230] He was aware of the force of his actions—that signing a contract would make its terms binding.[231] Unlike in *Eagle Force*, where a party testified that it was their practice to sign draft versions of agreements, Taylor testified that his policy was to consult with counsel before signing any agreement.[232] Taylor acknowledged that he was free to decide not to sign the SSAs on April 30, either calling Gomez's bluff or decisively causing HOL to walk away from the deal.[233] He understood his fiduciary responsibility to the

---

[230] Tr. 727:3–5 (Taylor).

[231] *Id.* at 727:5–728:7 ("Q: And you know what it means to sign a contract, don't you, sir? A: I do. Q: It means a promise. Correct? A: As I received one from Mr. Gomez as well, as you know. Q: You understand that a contract is a promise. Yes? A: I understand that a contract is a contract, yes. Q: And you consulted with the company's lawyers before you signed. Correct? A: I did. . . . Q: Your testimony was that Mr. Gomez asked you to sign to appease his investors. Correct? A: Yes. Q: To pacify and placate them. Correct? A: That's correct. Q: In order to appease his investors, he'd have to tell them that the deal was signed. Correct? A: He needed a signature, correct. Q: How else was he going to appease them other than to show them there was a signed deal? A: That's what I just said. He needed a signature, yes. Q: Were you intending to defraud the selling shareholders? A: Was I? Q: Yeah. A: No. Q: You signed an agreement that you knew he was going to show to his shareholders and say, look, they signed. Correct? A: He -- based on the agreement that we had, correct. Q: What was your plan when the investors who you knew he was going to be showing the signed agreement to asked to be paid? A: That was Mr. Gomez's issue. Q: He wasn't the one making the payments. Correct? It was House of Lithium. A: There would be no payments based on the agreement that Mr. Gomez and I had. Q: Well, there were payments, sir. Correct? A: The $2 million. Q: And then another million dollars after the signing. Correct? A: That's correct.").

[232] *Id.* at 665:12–23 ("I have a policy that, you know, if I'm going to put my signature on any sort of contractual document, that -- that it needs to be reviewed by counsel. This was especially true in this particular case, given that I'd been on the job for five days.").

[233] *Id.* at 696:22–697:3 (Taylor); *id.* at 708:20–709:13.

HOL stockholders and "believed at the time that it was in the best interests of [] the shareholders that we move forward to try to [] consummate a deal."[234]

The parties vigorously debate whether Gomez told Taylor that the signature was only to pacify Reby's investors and that the contract would not be enforced. Taylor contends that the statement was made and was the sole basis for his signature. Gomez contends that he said nothing of the sort, although he did promise to work with Taylor going forward. The only other party privy to these conversations, DeFrancesco, did not give testimony in this case.

Having considered the evidence at trial and observed the witnesses' credibility, I have reason to question the credibility of both Gomez and Taylor. Gomez seems to misunderstand some basic premises of transactional law, including the difference between signing and closing a deal. Likewise, his insistence that he did not know that he had embedded hyperlinks in emails to his stockholders and that the underlining was simply a decorative flourish was not credible.

Taylor's testimony was at times internally inconsistent and is contradicted by his later actions. Taylor's initial recollection of the circumstances surrounding his April 30 calls with Gomez was admittedly faulty. Taylor initially insisted that he had those conversations while he was in Florida, and that he signed the SSAs around

---

[234] *Id.* at 657:2–15.

midnight.[235] But he was later forced to recant, after evidence showed that he was in Oregon on that day.[236] In addition, Taylor said that after the SSAs were signed, he had a phone call with Gomez to remind him of his promise not to enforce the agreement.[237] But Taylor's subsequent email does not mention this purported promise and instead reassures Gomez that his requests for diligence concern only the RTO transaction.[238] On balance, Gomez's version of events, where he reassured Taylor that the parties would work together but did not go as far as to promise that the agreement would not be enforced, is more credible.[239]

HOL argues that the parties could not have intended the SSAs to be final and binding because they contained multiple misstatements reflecting a purchase by a public entity, HoLi, which did not yet exist. HOL also argues that Taylor could not reasonably intend to be bound by such an agreement, which would cause HOL to be

---

[235] JX 442 at 170:21–171:5; *id.* at 194:15–19.

[236] *See* JX 463; Tr. 700:10–708:2 (Taylor).

[237] Tr. 689:15–690:2 (Taylor).

[238] JX 305.

[239] "Deference to the factfinder's conclusions is greatest with respect to credibility determinations, but the factfinder 'may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness.'" *Berglund v. Horgan*, 1997 WL 695568, at *4 (Del. Ch. Oct. 17, 1997) (quoting *Studiengesellschaft Kohle mbH. v. Dart Indus., Inc.*, 666 F. Supp. 674, 680 (D. Del. 1987)). "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

in immediate breach of certain obligations under it. But Taylor understood that there were terms in the agreement that conflicted with the then-existing circumstances. Taylor discussed these terms with Gomez in their calls on April 30, before signing the SSAs.[240] He also acknowledged that HOL would owe $8 million immediately upon signing the SSAs.[241] Nevertheless, Taylor signed the agreements and did not make any contemporaneous record that he intended anything other than to be bound by the agreements.

On top of that, HOL has not offered any contemporaneous documentary evidence reflecting that Gomez told Taylor that he would not enforce the SSAs. Given the significance of such a promise, one would reasonably have expected Taylor to have documented it in some form.[242] But there is no such evidence on this issue among the plethora of emails and text messages exchanged between and among the parties. The absence of such evidence further undermines Taylor's credibility on this issue. Accordingly, the court finds that the evidence at the time of signing the SSAs establishes that the parties intended to be bound.

---

[240] Tr. 649:11–650:23 (Taylor).

[241] JX 221 at 2.

[242] "[I]f the record lacks documentation relating to a particular event, and if it is reasonable to expect that documentation would exist if the event took place, then the plaintiffs are entitled to a reasonable inference that the event did not occur." *Ontario Provincial Council*, 2023 WL 3093500, at *2.

The Plaintiffs point to HOL's post-signing conduct as further evidence of its intent to be bound by the SSAs. HOL, however, insists that under *Eagle Force I* the court may not consider post-signing evidence and, instead, is constrained to consider only the parties' communications up until the time that the contract was signed. The court does not read *Eagle Force I* as establishing the rigid rule that HOL derives from that decision.

The Delaware Supreme Court stated in *Eagle Force I* that in determining whether a party intended to be bound by a contract, "the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their words and actions—including the putative contract itself." 187 A.3d at 1229–30; *see id*. at 1230 ("Whether both of the parties manifested an intent to be bound is to be determined objectively based upon their expressed words and deeds as manifested at the time rather than their after-the-fact professed subjective intent." (quoting *Black Horse*, 2014 WL 5025926, at *12 (internal quotation marks omitted))). In *Eagle Force I*, the Court held that the trial court erred in collapsing the separate inquires of intent to be bound and definiteness of the agreement. *Id*. at 1230–31 & n.157. The Court then concluded that it was not proper for the trial court to consider post-signing evidence that created the specter that one side might not be able to perform, as evidence that the terms were too indefinite. *Id*. at 1234–35. The Court explained that such evidence was "a form of 'after-the-fact professed

subjective intent' that our courts typically refuse to consider.'" *Id.* at 1235 n.180 (quoting *Sarissa Cap. Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017)).

The Supreme Court's citation to *Sarissa* in *Eagle Force I* is instructive. In *Sarissa*, the parties had reached an oral settlement agreement during a phone call. 2017 WL 6209597, at *25. Thereafter, counsel for the parties began to revise documents reflecting the agreement. But before the documents were finalized, the defendant sought to renege on the deal. The court rejected that gambit, confirming that the parties had concluded an enforceable contract during their phone call. *Id.* at *22. In doing so, the court specifically noted that the post-call revisions to the settlement documents "reflect the attorneys' shared understanding that [the parties] had already reached a deal." *Id.* at *24. In relying on post-agreement evidence, the *Sarissa* court pointed to the Delaware Supreme Court's decision in *Trexler v. Billingsley*, 166 A.3d 101 (Del. 2017) (TABLE). Like *Sarissa*, *Trexler* also considered a party's post-agreement conduct to prevent him from reneging on a settlement agreement. Both *Sarissa* and *Trexler* stand for the proposition that "'[t]he parties' actions following the deal are also informative' in determining whether they mutually assented to be bound." *Sarissa*, 2017 WL 6209597, at *24 n.264 (quoting *Trexler*, 166 A.3d at 101); *see also* Restatement (Second) of Contracts § 202 cmt. g (1981) ("The parties to an agreement know best what they meant, and their action

58

under it is often the strongest evidence of their meaning."); 17A C.J.S. *Contracts* § 427 ("A party's conduct may be evidence of its intent . . . so long as that conduct evinces an interpretation contrary to that party's interest.").

*Eagle Force I* instructs the court to rely on evidence at the time of signing to determine if the parties intended to be bound. It generally precludes the court from considering a reneging party's attempt to use post-signing evidence of a subjective intent not to be bound. But the converse is not equally applicable. Rather, *Trexler* and *Sarissa* confirm that a court may consider a reneging party's post-signing conduct if it reflects an objective manifestation of the reneging party's intent to be bound by the agreement.

Here, HOL's post-signing conduct reflected an objective manifestation of its intent to be bound by the SSAs. First, Taylor signed an amended SSA for Restanca on May 10, 2022.[243] Second, HOL accepted several Reby stock certificates on Carta on May 12 and 13, 2022.[244] This evidence further confirms the court's finding that HOL intended to be bound by the SSAs when Taylor signed them on April 30, 2022.

---

[243] JX 261.

[244] JX 416. Plaintiffs also point to other evidence of intent, such as the wiring of $1 million to Reby on May 4, 2022, and HOL's lack of any objection to the issuance of the May 10 news release and TechCrunch article. That evidence, while consistent with an intent to be bound, is not nearly as persuasive as Taylor's signing the amended Restanca SSA and Waxman's manually accepting several Reby stock certificates.

## 2.     The SSAs Were Sufficiently Definite

The court must next determine whether the terms of the agreement are sufficiently definite. *Eagle Force I*, 187 A.3d at 1229. "This is mostly, if not entirely, a question of law." *Id.* at 1232. "[A] contract must contain all material terms in order to be enforceable, and specific performance will only be granted when an agreement is clear and definite and a court does not need to supply essential contract terms." *Ramone v. Lang*, 2006 WL 905347, at *10 (Del. Ch. Apr. 3, 2006).

The terms of a contract are sufficiently definite if they provide a basis for the existence of a breach and for giving an appropriate remedy. *Eagle Force I*, 187 A.3d at 1232 (citing Restatement (Second) of Contracts § 33(2)). Put another way, "[a] contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do." *Id.* "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." 1 Corbin on Contracts § 4.1 (1993). "[T]he degree of certainty required may be affected by the dispute which arises and by the remedy sought. Courts decide the disputes before them, not other hypothetical disputes which might have arisen." Restatement (Second) of Contracts § 33 cmt. b.

In *Black Horse*, this court held that an agreement was too indefinite to be enforceable when the plaintiffs failed to prove that the parties reached agreement on the definition of the asset to be transferred. 2014 WL 5025926, at \*18. The parties' differing descriptions of the asset "point[ed] to a vagueness that . . . any court would be ill-equipped to resolve." *Id.* at \*19. By contrast in *PharmAthene*, this court found it reasonably conceivable that a term sheet for a license agreement contained all material terms of the parties' agreement where it defined the nature and scope of licenses, the parties' objectives for their partnership, the licensing fees agreed to, and the structure for milestone and royalty payments. *PharmAthene, Inc. v. Siga Techs., Inc.*, 2008 WL 151855, at \*13–14 (Del. Ch. Jan. 16, 2008) (denying defendant's motion to dismiss).

HOL argues that the SSAs are insufficiently definite in three major areas: first, the SSAs name HoLi Technologies, Inc., a non-existent company, as the "Buyer"; second, the SSAs contemplate purchase by a public entity; and third, the consideration is not calculable when the Buyer is not publicly traded.

### a. References to HoLi

The first question is whether the references to HoLi rather than HOL render the SSAs too indefinite to be enforceable. Plaintiffs argue that the parties used HoLi and HOL interchangeably and that HOL regarded itself as the Buyer. I agree.

61

"An offer which appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties." Restatement (Second) of Contracts § 33 cmt. a. The parties' course of dealing here dispenses with any argument that this nomenclature is ambiguous. Each of the three term sheets leading up to the signing of the SSAs were signed by HOL.[245] The Second Term Sheet and the version of the SSA attached to it did not mention HoLi at all, despite HOL having publicly announced its plans for an RTO. Notes from HOL's counsel from days before the SSAs were signed describe the consideration for the transaction as "HOL CanCo Stock."[246] The parties understood the references to HoLi were inaccurate before they signed the agreement. On April 30, Habibi proposed a revised version of the agreement to Gomez, indicating that they had "made some other changes throughout the agreement to adjust for the fact that it is now a private company purchase by House of Lithium Ltd. (and not a purchase by the anticipate[d] resulting issuer to the RTO transaction)."[247] Although Gomez rejected the proposal to change the terms of the SSAs after they had already been signed by Reby's stockholders, the contemporaneous understanding between the parties was that the "Buyer" was HOL. To be sure, Taylor signed the SSAs on behalf of HOL.

---

[245] JX 18; JX 51; JX 111.

[246] JX 179.

[247] JX 216 at 3.

HOL argues that "the record is clear that HOL and HoLi Technologies were not understood to be interchangeable," citing two conversations that occurred in January 2022.[248] But Defendant ignores that SOL decided to name the resulting entity "HoLi Technologies" after it learned that naming the resulting entity "House of Lithium, Ltd." would create additional steps in the RTO process.[249] Conversations between DeFrancesco and Waxman in late 2021 confirm that the name HoLi Technologies Inc. was selected only because they could not use House of Lithium, Ltd.[250] HOL did not distinguish between itself and HoLi.[251]

In their course of dealing, the parties understood that references to the Buyer as "HoLi" were intended to refer to HOL. Accordingly, the misnomers in the SSAs do not render them insufficiently definite to be enforced.

---

[248] Def.'s Answering Br. 31.

[249] Tr. 576:5–24 (Habibi). Habibi explained that Canadian law would not permit Rio Verde to change its name to House of Lithium, Ltd. prior to the RTO, given the existence of an identically named entity in a different province. *Id.* While they could have decided to change HOL's name to a placeholder before merging the entities, SOL decided to streamline the process by just changing Rio Verde's name to HoLi Technologies, Inc. instead of House of Lithium, Ltd. *Id.*

[250] JX 27 ("HoLi Inc should be the acronym for House of Lithium. . . . We could not get the name House of Lithium in BC. You suggested HoLi Inc. instead. We couldn't get that either. We can have HOL Technologies Inc. . . . [T]his is just the corporate name.").

[251] JX 54 ("Holi tech is house of lithium").

### b.     Section 4.9(f)

HOL points to references in the SSAs that the Buyer would be a publicly traded entity as creating sufficient indefiniteness to establish a valid contract. Article 4 of the SSAs contains representations and warranties of the Buyer. Section 4.9 is a representation and warranty as to the Buyer's capital structure. Section 4.9(f) states:

> The currently issued and outstanding Buyer Shares are listed and posted for trading on the CSE and no order, agreement or memorandum of understanding that contemplates ceasing or suspending trading of the securities of Buyer is outstanding or in effect and no proceedings or agreement for this purpose have been instituted or, to Buyer's knowledge, are pending, contemplated or threatened.[252]

The parties had changed the structure of the transaction over the negotiation period. While the First and Second Term Sheets contemplated a purchase by HOL as a private entity, the Third Term Sheet and accompanying form of the SSAs contemplated a purchase by a public entity, HoLi Technologies Inc.[253] Accordingly, the SSAs incorporate terms that refer to a public company, naming HoLi Technologies Inc. as the "Buyer," including the Buyer's share price on the Canadian Securities Exchange as an input to calculate equity consideration, and representing that Buyer's shares were listed on the CSE.[254] But by the time that the SSAs were to be signed, the parties' understanding had changed again. With Gomez pushing

---

[252] JX 225 at 1–21 ("Model SSA"); *id.* § 4.9(f).

[253] JX 18; JX 51; JX 111.

[254] Model SSA at 1; *id.* at §§ 1.2, 4.9(f).

for a signature, HOL tried to get comfortable with a private company purchase. As explained above, at the time that the SSAs were signed, both parties understood that HOL, not HoLi, would be the Buyer, but the SSAs were not revised to reflect this change.[255] The court considers the references to HoLi and the flawed assumption of the equity consideration sections separately, and addresses only the inaccurate representation in Section 4.9(f) here.

Section 4.9(f) is inaccurate, but it does not render the agreement indefinite. Both parties understood that it was inaccurate but nevertheless executed the agreement. Contract terms are sufficiently definite if "they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) of Contracts § 33(2). Section 4.9(f) is a Buyer representation, not a Seller or Company representation. The SSAs contain no Buyer closing condition requiring HOL's listing as a public company. Habibi acknowledged that the deal could go forward as a private company purchase,[256] and Kania conceded that there was nothing to prevent HOL from going public after the signing of the SSAs.[257] "Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract."

---

[255] JX 179; JX 216.

[256] JX 352.

[257] Tr. 405:11–15 (Kania).

Restatement (Second) of Contracts § 33 cmt. a. That a contract contains inaccuracies does not foreclose it from being sufficiently definite. *See Bryant v. Way*, 2011 WL 2163606, at *4 (Del. Super. May 25, 2011) (finding that the memorialization of terms was sufficiently definite despite containing a scrivener's error). HOL's representation in Section 4.9 did not render the agreement too indefinite to be enforceable.

### c.     Consideration

HOL argues that the SSAs are unworkable and are too indefinite because the consideration to be paid for the Shares cannot be calculated without a publicly traded purchaser. Section 1.2 provides:

> Each Seller shall be entitled to receive that number of Class A common voting shares of Buyer (the "Buyer Shares") resulting from dividing (i) [a certain price in USD] by (ii) the lower of (A) 15% discount on the closing price of the Buyer Shares on the Canadian Securities Exchange (the "CSE") immediately preceding the date of this Agreement, and (B) CDN $3.60 (Canadian Dollars) provided that the price of each Buyer Share issued shall not be less than the minimum discounted price allowable by the CSE. Amounts i[n] USD shall be converted into Canadian Dollars (CDN) using the daily average rate of the Bank of Canada in effect at the close of business immediately prior to Closing.

HOL contends that the absence of publicly traded equity of the Buyer renders the SSAs insufficiently definite. Plaintiffs argue, however, that even if the Buyer were not a public company, the court could interpret the equity consideration section by employing the constant figure, CDN $3.60, provided by the SSAs.

66

A court will deny the existence of a contract only if the terms are so vague that they do not provide a basis for determining the existence of a breach and fashioning an appropriate remedy. *Eagle Force I*, 187 A.3d at 1232. Price is an essential contract term. 1 Williston on Contracts § 4:30 (4th ed. 2023). "[A]lthough the necessity for definiteness may compel the court to find that the language used is too uncertain to be given any reasonable effect, when the parties' language and conduct evidences an intent to contract, and there is some reasonable means for giving an appropriate remedy, the court will strain to implement their intent." *Id.* "If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." 1 Corbin on Contracts § 4.1 (1993).

In *Eagle Force I*, the court found that a written agreement containing blank schedules regarding the specific contracts and equity to be transferred was sufficiently definite because it allowed the court to ascertain the consideration to be transferred, and to provide a remedy if one party could or did not perform. 187 A.3d at 1233. The court noted:

> Even if Campbell could not deliver all the Targeted Companies Securities as promised, in addition to claims for breach of contract, Kay and the Company had possible recourse through actions for possible breaches via the warranty and/or indemnification provisions. But, . . .

the possibility that Campbell might not perform is a different question than the definiteness of the putative contract's terms.

*Id.*

The parties here came to a meeting of the minds regarding the consideration payable to each stockholder, which is divided between cash and stock consideration based on the stockholder's election.[258] The cash consideration is set at a fixed per share rate, which varies between SSAs.[259] Section 1.2 specifically delineates the process for calculating equity consideration, with specific inputs in subsection (i) for each SSA. Courts will find a price term lacking for indefiniteness when it does not provide "how much will be paid, how it will be paid, when it will be paid and to whom it will be paid." *Litle v. Waters*, 1992 WL 25758, at *6 (Del. Ch. Feb. 11, 1992). The SSAs describe how consideration should be calculated and delivered.

The parties urge the court to choose between their conflicting interpretations of Section 1.2. It need not do so at this stage. Under the SSAs, HOL promised to deliver stock in a public company in exchange for the Reby shares tendered. "[T]he

---

[258] Model SSA at § 1.2. Each of the SSAs are included in JX 225 and contain slight variations to pricing. For reference, the court will discuss the Model SSA as compared to other SSAs in the bundle, which will be referred to using page numbers within the almost 1,997-page exhibit.

[259] *Compare* Model SSA § 1.2(a) ("Each Seller shall be entitled to receive cash consideration in the amount of USD $1.2074 per Share"), *with* JX 225 at 22 ("Each Seller shall be entitled to receive cash consideration in the amount of USD $ 1.5851 per Share"), *and id.* at 43 ("Each Seller shall be entitled to receive cash consideration in the amount of USD $0.5639 per Share").

possibility that [it] might not perform is a different question than the definiteness of the putative contract's terms." *Eagle Force I*, 187 A.3d at 1237.

The court finds that the parties intended to conclude an agreement and that the agreement was sufficiently definite. Having determined that the parties formed a contract, the court now considers whether this contract is unenforceable against one or both parties as a result of fraud in the inducement or breach.

## C. Fraudulent Inducement

HOL argues that the SSAs are voidable because Plaintiffs fraudulently induced HOL to enter into the agreements.[260] The elements of fraudulent inducement are: (1) a false statement or misrepresentation, usually one of fact, made by the defendant; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement was intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) the plaintiff was injured as a result of the reliance. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983); *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 15035833, at *3 (Del. Ch. Oct. 26, 2022).

HOL argued that Gomez deliberately misled Taylor by representing that Taylor's signature would only be used to placate and pacify Reby investors, that the agreement would not be enforced, and that the parties would continue to negotiate

---

[260] Def.'s Opening Br. 46.

the transaction. As discussed above, the court does not find that Gomez represented to Taylor that his signature would not be binding and that Gomez would not enforce the agreement. HOL does not argue that there is an alternative basis for a finding of fraudulent inducement.[261] Having found there was no separate representation underlying this defense, the SSAs are not voidable as a result of fraudulent inducement.

## D. Unclean Hands

Defendant argues that Plaintiffs cannot enforce these agreements because they come to the court with unclean hands.[262] "The doctrine of 'unclean hands' provides that a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim, regardless of its merit." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80-81 (Del. Ch. 2008). HOL's unclean hands defense relies on the same facts and arguments underlying HOL's fraudulent inducement argument.[263] HOL's unclean hands defense fails for the same reasons as its fraudulent inducement argument.

---

[261] Def.'s Answering Br. 50 ("[T]he representation at issue did not relate to the terms of the deal, but rather to a separate understanding between parties.").

[262] Def.'s Opening Br. 43–45.

[263] Def.'s Answering Br. 50 n.29.

70

### E.    Is HOL Required to Close?

Having concluded that the parties entered into a valid contract, the court now turns to the issues of breach and performance.  Plaintiffs argue that HOL has breached the SSAs by refusing to close the transaction.  They seek a decree of specific performance, requiring HOL to close the transaction or, alternatively, an award of damages for breach.  HOL argues that it is not required to close the transaction because Plaintiffs have breached their representations and warranties under the SSAs.

### 1.    Closing Conditions.

Section 1.4 governs the time and place of closing.  It is indefinite and undated, stating that closing shall occur on "April __, 2022, or such other date as agreed to by the Sellers and the Buyer and, in any event, after all of the conditions hereunder have been satisfied or waived."[264]  HOL's obligation to close is governed by Section 5.1.  Plaintiffs acknowledged that Section 5.1 "clearly sets out the conditions which, if not satisfied, relieve HOL of its obligation to complete the transaction."[265]  Section 5.1 states, in full:

---

[264] Model SSA § 1.4.

[265] Pls.' Answering Br. 50; *see also* Pls.' Opening Br. 11 (noting that among the closing conditions under Section 5.1 was that "'[e]ach of the representations and warranties of Sellers and Company contained in [the SSA], respectively' be 'true and correct through the date of [the SSA] and as of the Closing.'").

> Conditions to Obligations of Buyer. The obligation of Buyer to complete the transactions contemplated hereby are subject to the conditions that on or before the Closing:
> (a) Each Seller shall deliver or cause to be delivered to Buyer an executed Stock Power.
> (b) Each of the representations and warranties of Sellers and Company contained in Article 2 and Article 3, respectively, hereof shall be true and correct as through the date of this Agreement and as of the Closing.
> (c) There is no prohibition at law against the completion of the transactions contemplated in this Agreement.[266]

Section 5.1 does not contain a materiality qualifier. This is a "flat" bringdown condition that "required Sellers to maintain their . . . [r]epresentations [and warranties] at closing in all respects." *HControl Hldgs. LLC v. Antin Infrastructure P'rs S.A.S.*, 2023 WL 3698535, at *5 (Del. Ch. May 29, 2023); *see Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *12 n.136 (Del. Ch. Mar 1, 2022) ("A closing condition expressly makes the truth of the representation(s) a condition to closing."). A bargained for allocation of risk between sophisticated parties must be enforced. *See Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *60 (Del. Ch. Oct. 1, 2018) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." (internal quotations omitted)), *aff'd*, 198 A.3d 724 (Del. 2018)

---

[266] Model SSA § 5.1.

(TABLE); *see Personnel Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) ("Delaware is a freedom of contract state, with a policy of enforcing the voluntary agreements of sophisticated parties in commerce.").

If the Sellers' or the Company's representations and warranties were not true and correct, HOL has no obligation to close. *See Akorn*, 2018 WL 4719347, at *63 ("'From a business point of view, the condition that the other party's representations and warranties be true and correct at closing is generally the most significant condition for Buyers.'" (quoting Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* §14.02[1], at 14-9 (2018 ed.) ("Kling & Nugent"))). "'[O]ne critical condition almost always found is that the other party's representations and warranties be true at closing. If this is not the case, the party need not close.'" *Id*. at *45 n.512 (quoting Kling & Nugent § 1.05[4], at 1-41).[267]

### 2. The Representations and Warranties at Issue

#### a. Section 3.9.

In Section 3.9, Restanca, the Sellers' representative, issued the following representation and warranty to Buyer with respect to the Company: "*Authorized and*

---

[267] Delaware courts regularly rely on the Kling & Nugent treatise as "an authoritative source on M & A practice." *Akorn*, 2018 WL 4719347, at *53 n.558 (collecting cases).

*Issued Capital*. Other than the Shares, there are no issued, outstanding or authorized securities of the Company."[268] The parties disagree as to the meaning of this provision. That dispute centers on the definition of the term "Shares" and is further complicated by the fact that HOL signed nearly 100 SSAs with individual stockholders of Reby. That issue requires consideration of the first two paragraphs of the SSAs. They read as follows:

> THIS SECONDARY SALE AGREEMENT, dated as of April __, 2022 (the "**Agreement**"), by and among the undersigned persons (each, a "**Seller**" and collectively, the "**Sellers**"), HoLi Technologies Inc. (the "**Buyer**") and Reby, Inc., a Delaware corporation and its successors and assigns (the "**Company**").
>
> WHEREAS, each Seller desires to sell to the Buyer and the Buyer desires to purchase from such Seller all of Seller's shares of capital stock of the Company owned by such Seller (collectively, the "**Shares**") subject to the terms and conditions set forth in this Agreement (the "**Secondary Sale**").[269]

This language appears to be a vestige of earlier drafts in which it was contemplated that all Reby stockholders would sign a single SSA. Instead, however, the parties changed plans and proceeded with each selling stockholder executing and delivering individual SSAs. Therein lies the interpretational dispute.

HOL argues that Section 3.9 has not been satisfied in two respects. First, "Shares" is defined as each individual Seller's shares of Reby stock, but no

---

[268] Model SSA § 3.9.

[269] *Id.* at 1.

individual stockholder held all issued, outstanding, or authorized securities of the Company.[270] Consequently, the representation and warranty in Section 3.9 was not satisfied as to each Seller who returned an SSA. Second, not all Reby stockholders delivered signed SSAs.[271] Therefore, the collective total of all SSAs does not constitute all issued and outstanding shares of Reby stock. Literally read, Section 3.9 is not satisfied.

Plaintiffs argue that HOL's reading of Section 3.9 leads to an absurd result and must be rejected. First, if Section 3.9 required a single seller of shares, then it could never be satisfied because the existence of more than one SSA "would render each SSA null *ab initio*."[272] Second, Section 3.9 could never be satisfied because HOL itself is a Reby stockholder, and HOL is not selling its shares. To avoid this absurd result, Plaintiffs urge the court to construe Section 3.9 to mean that as to each SSA, "the particular Selling Shareholder itself does not own any 'issued, outstanding or authorized securities of the Company' apart from those that it is conveying to HOL."[273] This, according to Plaintiffs, would make the representation accurate.

"Delaware adheres to the objective theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable

---

[270] *Id.*

[271] *Id.*; Def.'s Answering Br. 44.

[272] Pls.' Opening Br. 55.

[273] *Id.*

third party." *Osborne*, 991 A.2d at 1159 (internal quotations omitted). "Where . . . the plain language of a contract is unambiguous *i.e.*, fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions." *BLGH Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). "'[W]hen the language of a[] contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.'" *Id.* (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)). "[E]xtrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

Plaintiffs argue that the court must construe the contract to avoid absurd results and "give each provision and term effect and not render any terms

76

meaningless and illusory."[274]  Furthermore, "'a particular portion of an agreement' cannot be construed in a manner that 'runs counter to the agreement's overall scheme or plan.'"[275]  Plaintiffs' argument suggests the court can resolve the conflicting interpretations here without resort to extrinsic evidence.  "If parties introduce conflicting interpretations of a term, but one interpretation better comports with the remaining contents of the document or gives effect to all the words in dispute, the court may, as a matter of law and without resorting to extrinsic evidence, resolve the meaning of the disputed term in favor of the superior interpretation." *Wills v. Morris, James, Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998) (citing *E.I. du Pont de Nemours*, 498 A.2d at 1113).

Regardless of whether the court considers extrinsic evidence, Plaintiffs' proffered construction of Section 3.9 is not reasonable and does not harmonize the contract as a whole.  First, Plaintiffs' construction would mean that HOL would be required to close as long as the individual stockholders who signed SSAs conveyed all of their Reby securities.  Under that reading of the agreement, if only five stockholders owning just 10% of all Reby shares submitted SSAs, HOL would be required to close.  That would lead to an absurd result and "runs counter to the

---

[274] *Id*. (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc*., 261 A.3d 1199, 1208 (Del. 2021)).

[275] *Id*. (quoting *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co*., 498 A.2d 1108, 1113 (Del. 1985)).

77

agreement's overall scheme or plan," *E. I. du Pont de Nemours*, 498 A.2d at 1113, which is for HOL to acquire all Reby securities it does not already own. The court need look no further than Section 3.10, the very next representation and warranty, which states, in pertinent part: "No person has any written or oral agreement or option or any right or privilege . . . capable of becoming an agreement or option, including securities, warrants or other convertible obligations of any kind, for . . . the purchase of any securities of the Company."[276] Reading Section 3.9 in light of Section 3.10, the meaning of Section 3.9 becomes clear. HOL bargained for representations and warranties that there would be no other Reby securities, or rights to acquire Reby securities, outstanding at the time of closing. Stated positively, HOL obtained unqualified representations and warranties that it was acquiring all outstanding Reby securities without the risk of someone coming forward to claim a right to acquire Reby securities after closing. *Cf. HControl*, 2023 WL 3698535, at *27 (finding a contractual provision which required the sellers' capitalization representation to be "true and correct in all respects" to be unqualified when brought down to closing without materiality qualifier).

Plaintiffs' interpretation would further ignore the basic features of the SSA. The bundle of SSAs that Taylor signed on April 30 contained separate agreements

---

[276] Model SSA § 3.10(a).

from 92 Reby stockholders, totaling almost 2,000 pages in length.[277] The recitals of each SSA recognize that while the individual agreement governs the rights of the specific Seller who signs it, the specific agreement must be read in conjunction with the 91 other SSAs. They define "the undersigned persons" as "each, a '**Seller**' and collectively, the '**Sellers**.'"[278] In defining the "Shares," the SSA notes that "each Seller desires to sell to the Buyer . . . all of Seller's shares of capital stock of the Company owned by such Seller (collectively, the '**Shares**')."[279] The inclusion of the word "collectively" in enumerating the scope of the defined term "Shares" would make no sense here unless it was meant to include the total of all shares that each Seller were to convey to the Buyer.[280]

---

[277] JX 225.

[278] Model SSA at 1.

[279] *Id.*

[280] *See Collectively*, Dictionary.com, https://www.dictionary.com/browse/collectively (defining collectively: "as a whole group rather than as individual persons or things") (last visited June 30, 2023); *Collective*, Merriam-Webster, https://www.merriam-webster.com/dictionary/collectively (last visited June 30, 2023) (defining collective as "denoting a number of persons or things considered as one group or whole"); *cf. WBCMT 2007 C33 Office 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 482–83 (5th Cir. 2016) (noting that where the term "Borrower" was defined to include the borrowing entities "individually or collectively as the context may require" and where interpreting Borrower as a single entity would create "various absurdities," it was unambiguous in referring to the collective entities in appropriate contexts).

Section 3.9 is not a representation by an individual Seller, but is rather a representation by Restanca in respect of Reby as an entity.[281] The only reasonable reading of Section 3.9 is that it requires all Sellers, collectively, to own all outstanding shares of Reby that HOL does not already own. Indeed, that would be the natural reading of the SSAs if all of the selling stockholders had executed a single SSA, as the parties had originally planned.

If Section 3.9 were deemed to be ambiguous, then extrinsic evidence would confirm this interpretation. The Third Term Sheet dated March 16, 2022, that Gomez executed and delivered to HOL, described the transaction as follows: "The Buyer will acquire *all of the outstanding shares* of capital stock of the Company *not owned by the Buyer*, which represent on or about 83.33% of the Company's shares of capital stock outstanding (the "**Purchased Shares**") from the Company's stockholders for Cash Consideration of US$40,000,000, and Equity Consideration payable in Buyer Shares valued at US$45,000,000 on such terms set out in the Definitive Agreement."[282] Thus, the only reasonable construction of Section 3.9 is that there were no other securities of Reby issued, outstanding or authorized other

---

[281] *See* Model SSA § 3 ("With respect to the Company, Restanca LLC hereby represents and warrants to the Buyer as follows that at the time of the execution of this Agreement and at the time of the Closing"); *see, e.g.*, *id.* § 3.1 (representing that Reby has "the necessary corporate power, authority and capacity to enter into and perform its obligations under this Agreement"); *id.* § 3.2 (representing that "the Agreement" is a valid and binding obligation of the Company).

[282] JX 111.

than those held by HOL and those being acquired pursuant to all of the SSAs that were bundled and delivered to HOL.

### i. Section 3.9 Does Not Have a Materiality Qualifier.

Plaintiffs argue that HOL's obligation to close cannot be excused unless the breach of Section 3.9 is material. A materiality qualifier can appear in two places. The representation itself can be qualified, or the bring-down condition can be materiality-qualified. Neither is the case here. As explained above, Section 3.9 is unqualified. Section 5.1 is also unqualified. [283] Plaintiffs' attempt to impart a materiality qualifier to the bring-down provision in Section 5.1 is contrary to the plain meaning of the contract. *See Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL

---

[283] Section 5.1 enumerates a condition precedent to closing and will be enforced by its terms. *See* 1 Williston on Contracts § 38:6 (4th ed. 2023) ("As a general rule, unless the performance is waived, excused, or prevented by the other party, or unless it repudiates the contract, conditions which are either express or implied in fact must be literally met or exactly fulfilled, or no liability can arise on the promise qualified by the conditions. The reason for this is obvious. The promisor can only be held liable according to the terms of the promise it makes. . . . [I]f a party makes a promise to do an act on condition that it will receive $5.01, it cannot be required to perform on being paid $5."). Stock purchase agreements will often require "flat" or full compliance with capitalization and other fundamental representations. *See* ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* 248 (2d ed. 2010) [hereinafter Model Stock Purchase Agreement] ("Certain of Sellers' representations may be so fundamental that Buyer will want to retain the ability to terminate the acquisition if they are inaccurate in any respect."). Requiring full compliance with the capitalization requirement serves to avoid the "highly undesirable" situation of acquiring a target that "has even one minority shareholder, no matter how insignificant the percentage interest represented by those shares." *Id.* By requiring compliance with the representation, unmodified by materiality, the seller forecloses an argument by the buyer that the non-delivery of a small number of shares is not material. *Id.*

106924, at *15 (Del. Ch. Jan. 4, 2023) ("To require that the condition be material would undermine the very purpose of including such conditions in contracts, and our law imposes no such requirement."); *ev3, Inc. v. Lesh*, 114 A.3d 527, 529 (Del. 2014) ("Delaware law is clear that parties should not be bound by terms other than those they ultimately assent to in a complete agreement"); *CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *6 (Del. Ch. Oct. 1, 2012) ("Equity . . . will not rewrite a contract to save a party from its own negligence."); *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *6 (Del. Ch. July 23, 2010) ("Delaware law respects the freedom of parties in commerce to strike bargains and honors and enforces those bargains as plainly written."); *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 794 (Del. Ch. 2008) (declining to account for circumstances that the parties could have contracted around, but did not, in the context of conditions precedent); *see also Eagle Force I*, 187 A.3d at 1233 ("The text of the agreement defines which contracts should be delivered as *all* means *all*.").

Plaintiffs next argue for an implied materiality qualifier based on Section 3.29. That provision states:

> *Disclosure*.  No representation or warranty or other statement made by Restanca LLC respecting the Company in this Agreement or otherwise in connection with the transactions contemplated by this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make those statements, in light of the circumstances in which they were made, not misleading.

82

This provision does not operate as a materiality qualifier for Section 3.9 or Section 5.1.

Section 3.29 is a general representation and warranty covering a much broader category of statements beyond the specific representations and warranties. By contrast, Section 3.9 is a specific representation and warranty covering Reby's capital structure. As Plaintiffs acknowledge elsewhere: "Under black letter law, '[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.'"[284] Here, Section 3.9 speaks specifically to representations about the Company's capital structure and does not contain a materiality qualifier. The general provision in Section 3.29 cannot add a materiality qualifier to Section 3.9. If the parties wanted to include a materiality qualifier in Section 3.9, they could have done so, as they did with other representations and warranties.[285]

Section 3.29 of the SSAs is nearly identical to that contained in Section 3.29 of the ABA Mergers & Acquisitions Committee's Model Stock Purchase

---

[284] Pls.' Opening Br. 57 (quoting *AM Gen. Hldgs LLC v. Renco Gp., Inc.*, 2020 WL 3484069, at *4 (Del. Ch. June 26, 2020)).

[285] *See*, *e.g.*, Model SSA § 3.17 (representing that the Company is "in material compliance" with each of its property and asset leases); *id.* § 3.26 (representing that the Company is not in default "under any material term or condition of any of [its] insurance policies").

Agreement.[286]  The commentary to that provision confirms that this representation "is intended to fill any disclosure gaps and cover a fact or circumstance that might have fallen outside the scope of other Article 3 representations."[287]  Section 3.29 is not intended to add qualifiers to the other Article 3 representations.

### ii. The Anti-Sandbagging Argument.

Plaintiffs insist that HOL cannot rely on a breach of Section 3.9 to avoid its obligation to close because it knew at the time of signing that not all Reby stockholders had executed SSAs.[288]  For this, Plaintiffs rely solely on *Arwood v. AW Site Services, LLC*, 2022 WL 705841, at *31–32 & n.301 (Del. Ch. Mar. 9, 2022).

---

[286] Model Stock Purchase Agreement at 189.  Section 3.29 of the Model Stock Purchase Agreement provides:

> No representation or warranty or other statement made by Seller in this Agreement, the Disclosure Letter, any supplement to the Disclosure Letter, the certificate delivered pursuant to Section 8.3, or otherwise in connection with the Contemplated Transactions contains any untrue statement of material fact or omits to state a material fact necessary to make the statements in this Agreement or therein, in light of the circumstances in which they were made, not misleading.

*Id.*  As this court noted in *HControl*, "'[i]n an M&A transaction, agreements are not created from scratch.  Instead, they are based on provisions negotiated in prior deals and past practices' and lawyers 'negotiate provisions with knowledge of these past practices.'" 2023 WL 3698525, at *24.  The court concluded in that case that it was appropriate to consider custom and practice when evaluating the plain language of a merger agreement.  *Id.*

[287] Model Stock Purchase Agreement at 190; *see also* Daniel R. Avery, *10(b)(5) & Full Disclosure Representations*, Goulston & Storrs, https://www.goulstonstorrs.com/whats-market-blog/10b5-full-disclosure-representations (noting that this type of representation is often included in order to give buyers an indemnification claim for violations of Section 10b-5 of the Securities Exchange Act of 1934).

[288] Pls.' Opening Br. 56.

Plaintiffs' reliance is misplaced. *Arwood* was a post-closing fraud and breach of contract case where the seller argued that the buyers could not rely on representations in the purchase agreement when they knew pre-closing that the representations were false or were recklessly indifferent to their truth. *Id*. at *3. *Arwood* rejected that defense, both as a matter of law and fact, concluding that "Delaware is, or should be, a pro-sandbagging jurisdiction." *Id*. Thus, *Arwood* is contrary to Plaintiffs' position.[289]

As *Arwood* confirmed: "Delaware is more contractarian than most states, and our law respects contracting parties' right to enter into good and bad contracts. Our

---

[289] Unlike in *Arwood*, this case does not present the classic case of "sandbagging." Sandbagging, in the context of a business acquisition, "refers to a buyer who is or becomes aware that a specific representation and warranty made by the seller is false, yet instead of alerting the seller to this fact, the buyer consummates the transaction, despite its knowledge of the breach, and seeks post-closing damages against the seller for breach." *Arwood*, 2022 WL 705841 at *29. Here, the buyer has refused to close due to false representations and warranties. As *Arwood* and other cases have held, Delaware is a pro-sandbagging jurisdiction. *Id*. at *28–31 (surveying Delaware law and concluding that, absent definitive guidance from our Supreme Court, Delaware is a "sandbagging state"); *see Akorn*, 2018 WL 4719347, at *77–78 ("Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words."); *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) ("[A] breach of contract claim is not dependent on a showing of justifiable reliance. . . . Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words."), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE); *but see Eagle Force I*, 187 A.3d at 1236 n.185 ("acknowledg[ing] the debate over whether a party can recover on a breach of warranty claim where the parties know that, at signing, certain of them were not true"). Here, the buyer has not closed on the transaction. Instead, it has refused to close due to inaccurate representations and warranties.

courts enforce[] both." 2022 WL 705841, at *29 (internal quotations omitted).

Section 3.9 is an unqualified representation concerning Reby's capital structure, and Section 5.1 is a flat bring-down condition that Plaintiffs' representations and warranties be true at closing in all respects. *HControl*, 2023 WL 3698535, at *5.[290] Holding Plaintiffs to that unqualified representation as a condition to HOL's obligation to close is entirely consistent with Delaware law and the allocation of risk that sophisticated deal planners choose in drafting their agreements. As Vice Chancellor Laster reasoned in *Akorn*:

> From my perspective, the real question is whether the risk allocation in the contract controls, or whether a more amorphous and tort-like concept of assumption of risk applies. To my mind, the latter risks having cases routinely devolve into fact disputes over what was provided or could have been provided in due diligence. The former seems more in keeping with Delaware's contractarian regime, particularly in light of Delaware's willingness to allow parties to restrict themselves to the representations and warranties made in a written agreement.

*Akorn*, 2018 WL 4719347, at *77 n.756; *accord Arwood*, 2022 WL 705841, at *30.

Holding Plaintiffs to their unqualified representations does not create an unjust result. There were several possible alternatives that Plaintiffs could have negotiated to avoid this outcome. For example, Plaintiffs could have made either the capitalization representation or the bring-down condition expressly subject to a

---

[290] *See* Kling & Nugent § 14.02 (observing that to have a material qualifier in a bringdown would be inappropriate for representations concerning matters such as capitalization, authorization, and title to stock).

86

materiality condition. Or Plaintiffs could have negotiated for a provision saying that the shares represented all shares of the Company except for those listed on a disclosure schedule. Of course, Plaintiffs also could have negotiated for a different transactional structure to ensure that all shares would have been converted into the right to receive cash and stock of the buyer (*e.g.*, a merger).

Chancellor McCormick's recent decision in *HControl* is instructive. The agreement in *HControl* contained a condition to closing which brought down to closing certain "Fundamental Representations," including a capitalization representation. 2023 WL 3698535, at *27. Sellers repeatedly attempted to insert a materiality qualifier into this provision which would cabin the circumstances in which Buyers could refuse to close the agreement to situations in which the breach was not de minimis. *Id.* at *6. Buyers repeatedly struck this provision, and the final agreement required the Fundamental Representations to be "true and correct in all respects" at closing. *Id.* The court enforced the parties' written provision, which required complete compliance with the terms of the representation. *Id.* at *27, 38.[291]

HOL was entitled to rely on Plaintiffs' representations about Reby's capital structure contained in the parties' bargained for agreement. If that were not the case,

___

[291] Plaintiffs here attempted to add an anti-sandbagging provision to the SSAs in a draft circulated on March 14, 2022. JX 94 at 15. HOL struck the provision, commenting that "[i]t would be inappropriate to include an anti-sandbagging provision given the lack of opportunity to complete any diligence, and in particular given the lack of reps." JX 91 at 17.

"a seller's representations and warranties, and specific closing conditions would be meaningless." *Id.* at *38. That is not Delaware law. Accordingly, HOL is not obligated to close because Plaintiffs' representations and warranties in Section 3.9 are not true and correct.

### b.     Section 3.13

HOL next argues that Section 3.13 is not true and correct. In Section 3.13, Restanca represented that "[f]inal audited financial statements for Reby Rides S.L., . . . for the years ended December 31, 2019 and December 31, 2020, (collectively, the '**Financial Statements**') have been provided to the Buyer."[292] Plaintiffs do not dispute that these financial statements were never provided.[293] Rather, they argue that the failure to comply with the representation is not a material breach for several reasons. First, the transaction did not include going public as a condition precedent to closing. Second, HOL failed to establish that the IFRS audited financials would be required for public company disclosures. Third, HOL knew at the time that Taylor executed the SSAs that Reby had not provided HOL with IFRS-compliant financial statements.[294]

---

[292] Model SSA § 3.13.

[293] Pls.' Answering Br. 44–46.

[294] Plaintiffs also argue that HOL waived any argument as to Section 3.13 by failing to identify it as a contractual battleground in its pretrial brief. Pls.' Opening Br. 53 n.20. Plaintiffs do not dispute the facts underlying noncompliance with Section 3.13. Indeed,

As explained above, Section 5.1(b) imposes a flat bring-down condition unmodified by a materiality qualifier. Like Section 3.9, Section 3.13 does not incorporate a materiality standard and is not qualified by Section 3.29. Plaintiffs concede that Section 3.13 is not true and correct. Accordingly, HOL has no obligation to close.

### c. Sections 3.16 and 3.18

Finally, HOL contends that Plaintiffs have not complied with Sections 3.16 and 3.18. Section 3.16 represents: "Except to the extent reflected or reserved in the Financial Statements, the Company does not have any outstanding indebtedness or any liabilities or obligations (contingent or otherwise, including under any guarantee of any debt)."[295] Section 3.18 states: "To the Company's knowledge, the Company has always conducted and is continuing to conduct the business of the Company in compliance with all applicable laws."[296] HOL contends that these representations and warranties are not satisfied because Reby, Inc. did not file U.S. tax returns. Plaintiffs argue that Sections 3.16 and 3.18 do not cover the filing of tax returns,

---

they anticipated arguments as to Section 3.13, and they have been afforded the opportunity to respond to the argument after trial. *Cf. HControl*, 2023 WL 3698535, at *27. Accordingly, the court will address the argument.

[295] Model SSA § 3.16.

[296] *Id.* § 3.18.

because that topic is specifically addressed elsewhere in Section 3.15. Section 3.15 states:

> The Company operating business subsidiaries have filed all tax returns, reports and all other tax filings and has paid, deducted, withheld or collected and remitted on a timely basis all amounts to be paid, deducted, withheld or collected and remitted with respect to any taxes, interest and penalties as required under all applicable tax laws. The Company is not aware of any assessments, reassessments, actions, suits or proceedings in progress, pending or threatened, against the Company.[297]

Plaintiffs argue that, under principles of contract interpretation, the parties' more specific representation in Section 3.15 controls over the more general ones in Sections 3.16 and 3.18 and that a reading that allows Sections 3.16 and 3.18 to seep into the carveouts created by Section 3.15 would render Section 3.15 superfluous.[298] HOL contends that the sections do not overlap because Section 3.15 applies only to Reby's operating subsidiaries, whereas Section 3.16 and 3.18 apply to the Company itself.[299]

"Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). "'The primary goal of contract interpretation is to satisfy the

---

[297] *Id.* § 3.15.

[298] Def.'s Opening Br. 57.

[299] Def.'s Answering Br. 46–47.

90

reasonable expectations of the parties at the time they entered into the contract,' which 'often requires courts to engage in an analysis of the intent or shared understanding of the parties at the time of the contract.'" *ITG Brands, LLC v. Reynolds Am., Inc.*, 2019 WL 4593495, at *9 (Del. Ch. Sept. 23, 2019) (quoting *Demetree v. Commonwealth Tr. Co.*, 1996 WL 494910, at *3 (Del. Ch. Aug. 27, 1996)). In doing so, the court will favor specific language over general language if there is conflict, because it is reasonable to infer that "specific provisions express more exactly what the parties intended." *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993).

Under HOL's reading of the provisions, Sections 3.15, 3.16, and 3.18 would each govern any potential tax liabilities. Because Section 3.15 specifically addresses tax matters, the more general provisions in Sections 3.16 and 3.18 do not apply. HOL's assertion that Section 3.15 does not apply to the Company is also contrary to the plain language of that section. The representation that tax returns are filed applies only to the operating subsidiaries, but the last sentence does, in fact, cover the Company. "The *Company* is not aware of any assessments, reassessments, actions, suits or proceedings in progress, proceeding or threatened against the *Company*."[300]

---

[300] Model SSA § 3.15 (emphasis added).

Section 3.15 was a negotiated provision that represents and warrants that only the operating subsidiaries have filed all tax returns. HOL's counsel first inserted a tax representation broadly covering the *Company's* filing of all tax returns.[301] In addition, the final sentence representing the absence of any existing or threatened assessments and actions did not contain a knowledge qualifier.[302] Gomez struck almost the entire provision, leaving only the last sentence, which he further modified to represent that the Company *was not aware* of any pending or threatened proceedings against the Company.[303] After hearing "Habibi's 'no' for almost everything," the provision was updated to its current form, which provides that only the Company's operating subsidiaries have filed all tax returns and includes a knowledge qualifier as to any proceedings against Reby, Inc.[304]

The drafting history for Section 3.15 bears out Plaintiffs' position that the parties intended the representation to carve out the US entity itself for purposes of the actual filing of tax returns. To allow the broad stroke with which Sections 3.16 and 3.18 are painted to color over the carveout in Section 3.15 would render this specific language superfluous. Accordingly, Sections 3.16 and 3.18 must give way to the more specific provisions in Section 3.15.

---

[301] JX 83 at 34.

[302] *Id.*

[303] JX 84 at 8–9.

[304] JX 87 at 8.

92

## F.     Section 7.7

HOL argues that Plaintiffs breached Section 7.7 by announcing the transaction through a news release on May 10, 2022 without HOL's written permission.  Section 7.7 is a confidentiality provision which states, in pertinent part:  "Neither Seller, nor Buyer nor any of its representatives shall, directly or indirectly, issue any statement or communication to any third party . . . regarding the existence or terms of this Agreement . . . without the written consent of the other parties."[305]  Although HOL was certainly aware of the draft news release and Gomez's plans to issue it on May 11, there is no evidence that HOL provided Gomez written consent to do so.

As Plaintiffs point out, however, Section 7.7 is not a representation and warranty, and compliance with Section 7.7 is not among the closing conditions in Section 5.1.  Even if the issuance of the news release constituted a breach of Section 7.7, and even if that breach were material, which the court need not reach, HOL has not established that it suffered damages from the breach.  *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *14 (Del. Ch. Sept. 30, 2013) ("Plaintiffs have failed to state a breach of contract claim because [Plaintiffs] suffered no damage.").

---

[305] Model SSA § 7.7.

## G. HOL's Unjust Enrichment Claim

HOL argues in its opening brief that Reby has been unjustly enriched by the $2 million paid to it pursuant to the Third Term Sheet. HOL seeks an order requiring Reby either to repay that $2 million or convert it into Reby equity as contemplated by the Third Term Sheet. HOL devotes a mere eight lines of its opening brief to this claim and does not even recite the standard for unjust enrichment.[306] HOL's answering brief is sparser still—devoting a single, conclusory sentence to this claim.[307] The opposition brief also increases the amount sought to be returned from $2 million to $3 million without explanation.[308]

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999). To prevail on a claim for unjust enrichment, a party must prove "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy

---

[306] *See* Def.'s Opening Br. 58.

[307] Def.'s Answering Br. 54 ("Plaintiffs have been unjustly enriched by the $3 million paid to Reby to date.").

[308] This was not raised in the opening brief. Therefore, this belated attempt to inflate the amount of any claim of unjust enrichment is waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Emerald Partners has waived any argument it had against Hall Financial by not raising the issues in their opening brief").

provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). The fifth element need only be established if there is a dispute over jurisdiction. *See Garfield v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022).

Where an express, enforceable contract controls the parties' relationship, a claim for unjust enrichment will be dismissed. *Bakerman v. Sidney Frank Imp. Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006); *Albert v. Alex Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). It is HOL's burden to establish its counterclaim for unjust enrichment by a preponderance of the evidence. *See Schaeffer v. Lockwood*, 2021 WL 5579050, at *20 (Del. Ch. Nov. 30, 2021).

HOL made no attempt to explain or establish that its claim for the $2 million deposited with Reby under the Third Term Sheet was not one that could have been asserted as one for breach of contract under the binding terms of the Third Term Sheet. Indeed, HOL's brief betrays the notion that this claim is anything other than one grounded in contract, as it seeks an order requiring that Reby "convert the $2 million deposition into Reby equity as contemplated by the March Term Sheet."[309]

---

[309] Def.'s Opening Br. 60.

Taylor confirmed as much at trial.[310]  Therefore, HOL has failed to prove its claim for unjust enrichment.

## III.  CONCLUSION

For the reasons stated herein, the SSAs are valid contracts but HOL is not required to complete the transactions contemplated by those agreements because the conditions to closing are not satisfied.  HOL has not proved its claims for unjust enrichment or for any breach of contract that would entitle it to an award of damages. The parties should confer, provide a form of order consistent with this opinion, and inform the court if further issues remain that require the court's consideration.

---

[310] Tr. 744:16–21 (Taylor) ("Q:  And you understand that, as to the $2 million, that was documented.  Correct?  A:  The break-up fee, yes.  Q:  And it was pursuant to a contract. Correct?  A:  That's correct.").